**UNITED STATES of America, Plaintiff,**

**v.**

**UNIVERSITY HOSPITAL OF the STATE UNIVERSITY OF NEW YORK AT STONY BROOK, Defendant,**

**Parents of Baby Jane Doe,**
**Intervenor Defendants.**

**No. CV 83–4818.**

United States District Court,
E.D. New York,
Long Island Division.

Nov. 17, 1983.

Edith S. Marshall and Daniel P. Butler, Civ. Rights Div., U.S. Dept. of Justice, William Bradford Reynolds, Asst. Atty. Gen., Charles J. Cooper, Deputy Asst. Atty. Gen., Washington, D.C., for plaintiff.

Robert Abrams, N.Y. Atty. Gen., New York City, for Hospital; Melvyn Leventhal, Asst. Atty. Gen., Richard Rifkin, Deputy 1st Asst. Atty. Gen., Paul Glickman, Stanley Camhi, Frederick Mehlman, Donna Miller, Asst. Attys. Gen., Martha Shoemaker, New York City, Sanford Levine, Caroline Pasley, Lewis Rosenthal, Albany, N.Y., of counsel.

Reynolds, Caronia & Gianelli, Hauppauge, for parents.

## MEMORANDUM OF DECISION AND ORDER

WEXLER, District Judge.

### INTRODUCTION

In this action, plaintiff, the United States of America, seeks an order directing that one of the defendants, University Hospital of the State University of New York at Stony Brook, allow the Department of Health and Human Services access to the medical records of a handicapped infant, hereinafter referred to as "Baby Jane Doe". Plaintiff contends that plaintiff is entitled to such an order pursuant to Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, which provides, in pertinent part:

> No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance
> ....

Plaintiff also contends that plaintiff is entitled to said order pursuant to a regulation promulgated under said statute, 45 C.F.R. § 84.61, which regulation incorporates by reference the provisions of another regulation, 45 C.F.R. § 80.6(c), which latter regulation provides, in pertinent part, that each recipient of Federal financial assistance

> [S]hall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with this part ... Asserted considerations of privacy or confidentiality may not operate to bar the Department from evaluating or seeking to enforce compliance with this part. Information of a confidential nature obtained in connection with compliance evaluation or enforcement shall not be disclosed except where necessary in formal enforcement proceedings or where otherwise required by law.

Plaintiff contends that the Department of Health and Human Services must obtain the medical records of Baby Jane Doe in order to determine whether the defendant University Hospital, in failing to perform certain surgical procedures upon Baby Jane Doe to which the parents of Baby Jane Doe (who have intervened as defendants in this action) refused to give consent,

violated the provisions of 29 U.S.C. § 794 cited above. The defendant University Hospital, and the defendant parents of Baby Jane Doe, have filed separate motions to dismiss this action. Plaintiff has moved for summary judgment.

FACTS

1. On October 11, 1983, Baby Jane Doe was born, suffering from spina bifida, hydrocephalus, microcephaly, bilateral upper extremity spasticity, a prolapsed rectum, and a malformed brain stem.

2. The parents of Baby Jane Doe have refused to give consent to the University Hospital of the State University of New York at Stony Brook for the performance of surgical procedures upon Baby Jane Doe to treat the spinal defect and to drain the water from the infant's skull caused by the hydrocephalic condition, but have instead opted for a conservative treatment involving good nutrition and the administration of antibiotics and dressing of the exposed spinal sac to encourage the skin to grow over and protect it.

3. Consequently, the University Hospital of the State University of New York at Stony Brook has not performed the surgical procedures.

4. By means of a petition dated October 16, 1983, A. Lawrence Washburn, Jr., an attorney, commenced a proceeding in the Supreme Court of the State of New York, Suffolk County, seeking the appointment of a guardian *ad litem* for Baby Jane Doe, and an order directing that the University Hospital of the State University of New York perform the surgical procedures. The Supreme Court of the State of New York, Suffolk County, appointed William E. Weber as guardian *ad litem* for Baby Jane Doe. The University Hospital of the State University of New York at Stony Brook,

and the parents of Baby Jane Doe, appeared by their respective counsel, and evidence was taken. The Supreme Court of the State of New York, Suffolk County (Tanenbaum, J.), on October 20, 1983, determined that Baby Jane Doe was "in need of immediate surgical procedures to preserve her life," and ordered that the surgical procedures be performed.

5. On October 21, 1983, the Appellate Division of the Supreme Court of the State of New York determined that Baby Jane Doe was not in imminent danger of death, and that the parents of Baby Jane Doe, in refusing permission for the operations, made a reasonable choice among possible medical treatments, acting with the best interests of the child in mind. That court consequently reversed the decision of the Supreme Court of the State of New York, Suffolk County, and dismissed the proceeding.[1]

6. On October 28, 1983, the Court of Appeals of the State of New York determined that the Supreme Court of the State of New York, Suffolk County, had abused its discretion in having permitted the proceeding to go forward, since petitioner apparently had no relationship with the child, her family, or those treating the child; since the New York Legislature had placed primary responsibility for initiating child neglect proceedings upon child protection agencies; and since petitioner had apparently failed to contact those agencies. The Court of Appeals therefore affirmed the decision of the Appellate Division which dismissed the proceeding. The Court of Appeals left undisturbed, and indeed apparently endorsed, the determination by the Appellate Division that the parents of Baby Jane Doe had acted reasonably and with

1. The Appellate Division summarized the record as follows:

The record confirms that the failure to perform the surgery will not place the infant in imminent danger of death, although surgery might significantly reduce the risk of infection. On the other hand, successful results could also be achieved with antibiotic thera-

py. Further, while the mortality rate is higher where conservative medical treatment is used, in this particular case the surgical procedures also involved a great risk of depriving the infant of what little function remains in her legs, and would also result in recurring urinary tract and possibly kidney infections, skin infections and edemas of the limbs.

the best interests of the child in mind.[2]

7. During the period in which the state court proceedings were taking place, the Department of Health and Human Services received a complaint that Baby Jane Doe was being discriminatorily denied medically indicated treatment on the basis of her physical and mental handicaps.

8. The Department of Health and Human Services referred the complaint to the New York State Child Protection Service, which concluded that there was no cause for state intervention. The Service is a state agency, federally approved under the Federal Child Abuse Prevention and Treatment Act, created to investigate suspected instances of child abuse, mistreatment, and neglect.

9. Since October 22, 1983, the Department of Health and Human Services, which was already in possession of Baby Jane Doe's medical records through October 19, 1983, has repeatedly requested that the University Hospital of the State University of New York at Stony Brook provide the Department with access to all of Baby Jane Doe's medical records. The University Hospital, acting in part on the refusal of Baby Jane Doe's parents to consent to the release of the records, has refused to release the records.

10. The University Hospital receives reimbursement from the federal government for the cost of providing medical services which are rendered to persons who are eligible beneficiaries under the Medicare and Medicaid programs, but is not otherwise a recipient of federal funds.

11. Papers submitted to the Court conclusively demonstrate that the parents of Baby Jane Doe, in refusing permission for said surgical procedures, made a reasonable choice among possible medical treatments, acting with the best interests of the child in mind.[3]

JURISDICTION

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1345, since the plaintiff is the United States of America, and pursuant to 28 U.S.C. § 1331, since the plaintiff's cause of action, if any, arises under a federal statute, 29 U.S.C. § 794.

LACHES

Defendant University Hospital has argued that this action is barred by laches. Specifically, defendant University Hospital argues that plaintiff could have intervened in the state court proceedings, and that since plaintiff chose not to do so, it would be inequitable to permit plaintiff to now maintain this action.

■ We find that this action is not barred by laches. It appears from the papers submitted to the Court that the Department of Health and Human Services received a complaint concerning the University Hospital's allegedly discriminatory treatment of Baby Jane Doe almost contemporaneously with the commencement of the state court proceedings. Under such circumstances, the failure of plaintiff to intervene in the state court proceedings cannot bar plaintiff from maintaining this action.

DOCTOR–PATIENT EVIDENTIARY PRIVILEGE

■ Plaintiff's demand for access to the medical records of Baby Jane Doe is not barred by a doctor-patient evidentiary privilege. In the first place, plaintiff is simply attempting to obtain the records for its own examination at the present time, and is not attempting to have the records introduced into evidence before the Court. There is in any case no doctor-patient evidentiary privilege in a federal court proceeding except with respect to an element of a claim or defense as to which state law supplies the rule of decision. Rule 501 Fed.R.Evid.; *United States v. Meagher*, 531 F.2d 752 (5th Cir.1976), *cert. denied*, 429 U.S. 853, 97 S.Ct. 146, 50 L.Ed.2d 128 (1976); *Robinson v. Magovern*, 83 F.R.D.

---

**2.** For relevant extracts from the New York Court of Appeals decision, *see* note 7.

**3.** For a discussion of the reasonableness of the parents' decision, *see infra*.

79 (W.D.Pa.1979); *In re Grand Jury Subpoena,* 460 F.Supp. 150 (W.D.Mo.1978); *Hardy v. Riser,* 309 F.Supp. 1234 (N.D. Miss.1970); J. Weinstein, 2 *Weinstein's Evidence* § 504[01].

Of course, the fact that plaintiff's demand for access to the records is not precluded by a doctor-patient *evidentiary* privilege is independent of the question of whether such access may be barred by either the constitutional right to privacy or by statutorily created rights. *See infra.*

## MEDICAID AND MEDICARE AS "FEDERAL FINANCIAL ASSISTANCE"

■ The next issue is whether the University Hospital of the State University of New York at Stony Brook receives federal financial assistance within the meaning of 29 U.S.C. § 794, and is therefore subject to the prohibition against discrimination against the handicapped of 29 U.S.C. § 794 and to regulations promulgated thereunder, including 45 C.F.R. § 84.61 and 45 C.F.R. § 80.6(c). The University Hospital does not receive any federal funds except for reimbursement under the Medicare and Medicaid programs. The Court holds that a hospital that receives reimbursement under the Medicare or Medicaid programs receives federal financial assistance within the meaning of 29 U.S.C. § 794, and is therefore subject to the provisions of 29 U.S.C. § 794 and the regulations promulgated thereunder in its provision of medical services.

In reaching this conclusion, the Court begins by noting that, on their face, Medicaid and Medicare reimbursements would appear to qualify as federal financial assistance. Medicaid and Medicare are indisputably federal programs, and the reimbursements to hospitals which they provide are indisputably financial in nature. The only legitimate question which could arise in determining whether such reimbursements constitute federal financial assistance would therefore appear to turn on the meaning of the word assistance.

■ Defendant University Hospital has argued that such reimbursements do not constitute assistance because they are merely payments for services rendered rather than gifts. *See Trageser v. Libbie Rehabilitation Ctr., Inc.,* 462 F.Supp. 424 (E.D.Va.1977), *aff'd,* 590 F.2d 87 (4th Cir. 1978), *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979). As plaintiff points out, however, all forms of federal financial assistance within the meaning of the Rehabilitation Act are designed to enable the recipient to provide certain services to the class of persons that Congress intends to benefit. The mere fact that the recipient of funds performs some service to justify the receipt of such funds does not mean that the recipient is not receiving federal assistance. To reason otherwise would render the act meaningless. Of course, recipients of federal financial assistance ordinarily do not perform any service until *after* receiving funds, whereas a hospital may provide medical services *before* receiving reimbursement for them through Medicaid or Medicare, but we see no reason why the time funds are received should be controlling in determining whether such funds constitute assistance within the meaning of the Rehabilitation Act.

Defendant University Hospital further argues that reimbursements under the Medicaid and Medicare programs are analogous to payments made under procurement contracts or insurance contracts, which types of payments are expressly declared not to constitute federal financial assistance by 45 C.F.R. § 84.3(h).

There is an important distinction between procurement contracts, on the one hand, and the relationship between the government and a hospital receiving reimbursements under Medicaid or Medicare, on the other. Under a procurement contract, a company provides goods or services to the government. Such goods or services are not supplied directly to the public. The government may employ such goods or services in carrying out activities which ultimately benefit the public, or may ultimately distribute such goods to the public, but the company providing the goods or services itself has no direct relationship to the public. By contrast, a hospital receiv-

ing reimbursements under Medicaid or Medicare provides services directly to the public, or, more precisely, to that portion of the public entitled to Medicaid or Medicare coverage. Procurement contractors were undoubtedly excluded from coverage by the Act in order to avoid excessive government infringement upon the private sector. A procurement contractor stands in relationship to the government in a manner similar to that in which a private contractor stands to his client. Recipients of federal financial assistance within the meaning of the act by contrast, engage in the types of activities which governments are created to provide, and therefore, even if only in a very limited sense, may be said to fulfill the aim of the federal programs.

Further, the relationship between a hospital receiving reimbursement under Medicaid or Medicare and the government is not analogous to an insurance contract. Medicare and Medicaid are not funded by beneficiaries' premium payments, but by a payroll tax. This is not the form of conventional insurance. Rather, it is comparable to the Social Security Program. Nor do Medicare and Medicaid fall into the excluded category of federally sponsored insurance of individual homes, businesses, or loans. Clearly, the hospital is not insured against any risk under the programs.

Examination of the legislative history of the Medicaid and Medicare programs shows that Congress contemplated that receipt of funds under these programs would subject the recipient to coverage under Title VI of the Civil Rights Act of 1964, upon which 29 U.S.C. § 794 is modeled.[4]

Examination of case law shows that a long line of cases have held that reimburse-ments under Medicaid and Medicare constitute federal financial assistance.[5]

The question arises as to whether the provisions of 29 U.S.C. § 794 and of regulations promulgated thereunder apply to all activities of recipients of federal financial assistance, or only to those activities for which the federal financial assistance in question is provided.[6] We need not address this issue here. In the instant case, Medicaid and Medicare funds were provided to the defendant University Hospital in order that the hospital would provide medical services. The activity in question which plaintiff contends is possibly being conducted in a discriminatory manner is the provision of medical services, the very activity which the Medicaid and Medicare programs were designed to foster. It is unclear from the record whether Baby Jane Doe is herself a beneficiary under the Medicaid program, and in view of her protected identity it is not possible to know. Whether Baby Jane Doe is herself a beneficiary or not is irrelevant. *See United States v. Baylor University Medical Center*, 564 F.Supp. 1495 (N.D.Tex.), *stay granted pending appeal*, 711 F.2d 38 (5th Cir.1983).

STANDARDS FOR DETERMINING GOVERNMENT'S RIGHT OF ACCESS TO RECORDS

■ As noted above, the regulation under which plaintiff is suing to obtain the medical records in question, 45 C.F.R. § 80.6(c), incorporated by reference in 45 C.F.R. § 84.61, provides that the Department of Health and Human Services may obtain access to such records "as may be pertinent to ascertain compliance with this part", i.e., as may be pertinent to ascertain

---

4. For relevant legislative history of Medicaid and Medicare, *see* 111 Cong.Rec. 15803, 15813.

5. The proposition that Medicaid and Medicare reimbursements constitute "federal financial assistance" has been upheld in *United States v. Baylor University Medical Center*, 564 F.Supp. 1495 (N.D.Tex.1983); *stay granted pending appeal*, 711 F.2d 38 (5th Cir.1983); *NAACP v. Wilmington Medical Center, Inc.*, 453 F.Supp. 280, 453 F.Supp. 330 (D.Del.1978); *United States v. Cabrini Medical Center*, 497 F.Supp. 95, 96 n. 1 (S.D.N.Y.1980), *rev'd on other grounds*, 639 F.2d

908, 910–11 (2d Cir.1981); *Bernard B. v. Blue Cross and Blue Shield*, 528 F.Supp. 125, 132 (S.D.N.Y.1981), *aff'd*, 679 F.2d 7 (2d Cir.1982); *Flora v. Moore*, 461 F.Supp. 1104, 1115 (N.D. Miss.1978); *Bob Jones University v. Johnson*, 396 F.Supp. 597, 603 n. 21 (D.S.C.1974), *aff'd*, 529 F.2d 514 (4th Cir.1975).

6. For a discussion of the issue of "program specificity", *see University of Richmond v. Bell*, 543 F.Supp. 321 (E.D.Va.1982).

whether the recipient of federal financial assistance is or is not discriminating against handicapped persons. It therefore follows that if a recipient of federal financial assistance is clearly not violating 29 U.S.C. § 794 by discriminating against handicapped persons, the Department of Health and Human Services may not obtain access to the records of such recipient pursuant to 45 C.F.R. §§ 80.6(c) and 84.61. This obvious principle, which has never been denied by plaintiff, is fully in accord with the long line of cases establishing that the power of administrative agencies to conduct investigations and subpoena records, although quite broad, is not unlimited. In *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943), the Supreme Court explained that an administrative agency could obtain evidence "not plainly incompetent or irrelevant to any lawful purpose" of the agency in the discharge of its duties, *id.* at 509, 63 S.Ct. at 343. Clearly, in the event that it can be conclusively demonstrated that the recipient University Hospital has not violated the Rehabilitation Act by discriminating against the handicapped infant Baby Jane Doe on the basis of her handicap, the medical records of Baby Jane Doe would be "plainly irrelevant or incompetent" to the purpose for which plaintiff contends they must be obtained, namely the determination of whether the recipient is violating the Act. We must therefore turn to the question of whether, from the papers submitted to the Court, it can be clearly determined that the defendant University Hospital has not violated the statute by discriminating against a handicapped person.

## DETERMINATION OF WHETHER THE DEFENDANT UNIVERSITY HOSPITAL HAS VIOLATED THE PROHIBITION OF 29 U.S.C. § 794 AGAINST DISCRIMINATION

█ It is undisputed that the defendant University Hospital has at all times been willing to perform the surgical procedures in question, if only the parents of Baby Jane Doe would consent to such procedures. Further, the defendant University lacks the legal right to perform such procedures, unless there is consent by either the child's natural guardians (i.e., her parents), or by some other legally appointed guardian. It would appear, therefore, that the defendant University Hospital has failed to perform the surgical procedures in question, not because Baby Jane Doe is handicapped, but because her parents have refused to consent to such procedures. The defendant University Hospital has therefore not violated the Rehabilitation Act by subjecting a handicapped individual to discrimination solely by reason of her handicap. It might, however, be argued that the parents, in refusing to consent to the surgical procedures, made a decision which, had it been made by a recipient of federal financial assistance, would have been violative of the Act and that the University Hospital, in carrying out such a decision, violates the Act, and should not be allowed to hide behind the decision of the parents. Such an analysis, even assuming for a moment the validity of the hypothesis would be invalid. The defendant University Hospital lacks the legal authority to perform such procedures. It may well be that if a recipient of federal financial assistance, by an act of discretion, chooses to discriminate against a handicapped individual because the parent of such individual desires, solely because of the individual's handicap, that such individual be discriminated against, such recipient violates the Act. That issue is not before this Court. In the instant action, the defendant University Hospital has complied with a request made by a handicapped child's parents regarding the medical treatment of that child, not merely out of choice, but also in obedience to the legal requirement that said Hospital not perform operations upon a child without the consent of the child's guardians. Consequently, the failure of the defendant University Hospital to perform the surgical procedures cannot possibly be regarded as a violation of the Rehabilitation Act.

█ In any case, the papers submitted to the Court demonstrate conclusively that the decision of the parents to refuse con-

sent to the surgical procedures was a reasonable one based on due consideration of the medical options available and on a genuine concern for the best interests of the child. Consequently, even assuming that a hospital's failure to perform an operation upon a handicapped child due to the refusal of the parents to consent to such operation may give rise to a violation of 29 U.S.C. § 794 if the parent's refusal was based upon discriminatory considerations and not upon a reasonable consideration of the medical options available in light of the best interests of the child, it is clear that the defendant University Hospital in the instant action has not committed such a violation of the Act.

In reaching the conclusion that the parents have made a reasonable choice among alternative medical treatments, the Court's cognizant of all the prior proceedings which have been had in this matter. During the state proceedings Doctors Newman and Butler of University Hospital testified that the parents' choice was a reasonable one, and that the hospital would perform the surgery at any time the parents requested. The Appellate Division of the Supreme Court of New York determined that the parents' decision was a reasonable one. The Court of Appeals of the State of New York, although not addressing itself directly to the merits of the controversy, implicitly sanctioned the Appellate Division's determination.[7] The New York State Child Protection Service, to which plaintiff referred a complaint about the child's treatment, similarly found that there was no basis for any state intervention.

The reasonableness of the parents' choice is apparent from the Appellate Division's summary of the medical testimony offered at the Supreme Court hearing:

The record confirms that the failure to perform the surgery will not place the infant in imminent danger of death, although surgery might significantly reduce the risk of infection. On the other hand, successful results could also be achieved with antibiotic therapy. Further, while the mortality rate is higher where conservative medical treatment is used, in this particular case the surgical procedures also involved a greater risk of depriving the infant of what little function remains in her legs, and would also result in recurring urinary tract and possibly kidney infections, skin infections and edemas of the limbs.

## RIGHT TO PRIVACY

Defendants have contended that release of Baby Jane Doe's medical records to the Department of Health and Human Services without the consent of the child's parents would violate the constitutional right to privacy and New York state legislation concerning the confidentiality of the doctor-patient relationship. Although the Court does not reach these issues, since we have determined that, given the facts appearing from the papers submitted to the Court, plaintiff is in any case not entitled to the relief sought, the Court nevertheless feels that some comment on these issues would be appropriate.

The defendants' reliance upon the constitutional right of privacy is extremely weak. In the instant action, plaintiff is, at least implicitly, alleging the possibility that the parents of Baby Jane Doe, in refusing their consent to surgical procedures, were not acting in the best interests of the child. It would be highly paradoxical if an individual's right to privacy could be asserted by

---

7. The New York Court of Appeals, in its opinion, stated that "[i]t would serve no useful purpose at this stage to recite the unusual, and sometimes offensive, activities and proceedings of those who have sought at various stages, in the interests of Baby Jane Doe, to displace parental responsibility for the management of her medical care." The Court further stated that "[t]here are overtones to this proceeding which we find distressing ... We find no justification for resort to or entertainment of these proceedings." The Court also stated that it did not "mean to define the exact extent of the Court's obligation to conduct an independent investigation or to consult with a child protective agency. There may be occasions when it would be appropriate for the Court to act without making further inquiry of this nature. On the record, however, no such circumstances are evident."

that individual's parent or guardian, purportedly acting in that individual's own best interests, for the purpose of precluding an inquiry into the question of whether the parent or guardian was in fact acting in the individual's best interests.[8] In the instant action, the Court has found that the parents in question are in fact acting upon a reasonable interpretation of the child's best interests. Under different facts, however, it is quite possible that an assertion by a parent on behalf of a handicapped child of the child's right to privacy made to preclude the release of the child's medical records to officials would not be sustained as a valid invocation of the constitutional right to privacy. This would be particularly so in those situations in which the officials in question provide a guarantee that such medical records will be kept confidential, and in which the officials possess a firm basis for believing that the child is in grave danger. *See Lora v. Board of Education of the City of N.Y.*, 74 F.R.D. 565 (E.D.N.Y.1977).

Plaintiff has, of course, never contended that the Act authorizes the federal government to involve itself in the choice among alternative reasonable medical treatments for handicapped children. Such a contention would be virtually impossible to reconcile with the language, legislative history, and court interpretation of the statute, and would raise grave constitutional questions concerning the right to privacy. Having said this, the Court need not discuss the extent to which the statute authorizes challenges by the federal government to *unreasonable* choices of medical treatment for handicapped children. We may note, however, that it is quite possible that the statute does authorize such challenges. If so, this would appear to be a constitutional exercise of federal legislative power, given the federal interest in preventing discrimination against the handicapped in hospitals receiving federal financial assistance, and 45 C.F.R. § 80.6(c) (as incorporated in 45 C.F.R. § 84.61) would appear to authorize the Department of Health and Human Services to obtain the medical records of handicapped children in situations where such records would be truly pertinent to a determination of whether a handicapped child was being denied reasonable medical treatment by a hospital receiving federal financial assistance, and would, as a regulation validly promulgated to implement a federal statute, of course supersede state statutes barring release of such records.

ORDER

The Clerk shall enter summary judgment in favor of the defendants and against the plaintiff, denying the plaintiff all relief.

SO ORDERED.

---

8. *Cf. State v. Hunt,* 2 Ariz.App. 6, 406 P.2d 208 (1965).