**The PEOPLE of the State of New York, by Dennis C. VACCO, Attorney General of the State of New York, Plaintiff,**

v.

**The MID HUDSON MEDICAL GROUP, P.C. Defendant.**

No. 94 Civ. 4688 (HB).

United States District Court, S.D. New York.

Feb. 6, 1995.

144

Dennis C. Vacco, Atty. Gen., of the State of N.Y., New York City, Michael A. Schwartz, Angie I. Martell, Asst. Attys. Gen., of counsel for plaintiff.

Anderson, Banks, Curran & Donohue, Mount Kisco, NY, Maurice F. Curran, of counsel, for defendant.

### OPINION AND ORDER

BAER, District Judge:

G. Oliver Koppell, the Attorney General of the State of New York in 1994, brought this action on behalf of the People under (1) Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.;* (2) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); (3) Sections 63(12) and 296 of the New York Executive Law; and, (4) Section 40–c of the New York Civil Rights Law to redress defendant's alleged "practice of unlawful, discriminatory conduct against people with hearing impairments in the provision of medical services" by refusing to provide sign language interpreters at medical examinations. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl.Mem.") at 2. Plaintiff seeks to enjoin defendant from such unlawful discrimination, and also seeks compensatory and punitive damages, statutory penalties and attorney's fees. *Id.* at 6.

Defendant, the Mid Hudson Medical Group, P.C. ("Mid Hudson"), moves to dismiss the federal claims in the complaint and the supplemental complaint for (1) lack of jurisdiction and failure to state a claim, Fed. R.Civ.P. 12(b)(1) and (6), alleging that the People of the State of New York are not a "person aggrieved" under the ADA and Section 504 and thus lack standing; and (2) failure to set forth the requisite jurisdictional facts under the ADA or Section 504, Fed. R.Civ.P. 8. Mid Hudson has also moves for dismissal of the New York claims for lack of supplemental jurisdiction in case I dismiss the federal claims. For the reasons stated below, I deny Mid Hudson's motion to dismiss in all respects.

Separately, Mid Hudson moves to compel production of certain documents which plaintiff claims are protected by the attorney work product doctrine. For the reasons discussed below, I deny Mid Hudson's motion to compel.

## I. *Factual Background*

Mid Hudson operates a large medical practice at four facilities in New York's Westchester, Putnam and Dutchess counties. Mid Hudson's 19 physicians and staff of 90 treat approximately 50,000 patients a year. Currently, Mid Hudson has seven to ten hearing impaired patients. Plaintiff contends that, in violation of federal and state statutes, defendant refuses to provide interpretive services for these patients. As a result, these patients must resort to notewriting and lip-reading to communicate with their doctors. Plaintiff bases its allegations on the experience of James Boardman, a hearing and vision impaired patient at Mid Hudson. In May 1994, Mr. Boardman asked Mid Hudson to provide an interpreter for his scheduled physical examination. Mid Hudson denied his request. Mr. Boardman later hired his own interpreter and submitted the bill for his services to Mid Hudson for reimbursement. Defendant refused to pay the bill.

At about the same time, the New York State Attorney General's Office conducted an investigation of Mid Hudson. Two investigators called without disclosing that they were

in the employ of the plaintiff and asked Mid Hudson to provide interpreters for medical appointments of hearing impaired relatives. Both requests, made a few weeks apart, were denied.

In August 1994, Mr. Boardman renewed his request for interpretive services, this time for an appointment scheduled for his daughter. Mr. Boardman's daughter is not hearing impaired but relies on her father's guidance during doctors visits. Defendant again refused the request. As before, Mr. Boardman appeared with an interpreter he had hired. In a later emergency visit for his daughter, Mid Hudson similarly failed to provide interpretive services.

Plaintiff claims that defendant discriminates against people with hearing disabilities in violation of both the ADA and the Rehabilitation Act by "rigidly adher[ing] to a policy rejecting the provision of sign language interpreters for patients with hearing impairments." Pl.Mem. at 6. Defendant contends that plaintiff is not a "person aggrieved" under the federal statutes and thus lacks standing to sue. Additionally, defendant argues that it is not a program receiving federal funding for purposes of the Rehabilitation Act.

## II. *Motion to Dismiss*

### A. The Standard for Rule 12(b) Motions

■ When considering the sufficiency of a complaint under a Rule 12(b) motion to dismiss for failure to state a claim or for lack of jurisdiction over the subject matter, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992).

The issue [on a motion to dismiss] is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the

pleadings that a recovery is very remote and unlikely but that is not the test. *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991).

## B. The State's Standing to Sue in *Parens Patriae*

■■■■ The ancient common-law prerogative to sue in *parens patriae*

is inherent in the supreme power of every State, whether that power is lodged in a royal person, or in the legislature, [and] is a most beneficent function ... often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves.

*Late Corporation of the Church of Jesus Christ of Latter–Day Saints v. United States*, 136 U.S. 1, 57, 10 S.Ct. 792, 808, 34 L.Ed. 478 (1890). *Parens patriae* means literally "parent of the country." Black's Law Dictionary 1003 (5th ed. 1979). Defendant claims that the failure of the ADA and Section 504 to specifically provide for enforcement by state attorneys general precludes suits by them. Plaintiff responds that it has standing under the *parens patriae* doctrine to seek redress for injury to its citizens.

We have found no case holding that a state has *parens patriae* standing to sue under the ADA or under Section 504 and, not surprisingly, we have found no authority that provides such standing to a state attorney general. However, states have frequently been allowed to sue in *parens patriae* to other enforce federal statutes that, like the ADA and Section 504, do not specifically provide standing for state attorneys general. In the leading case, the Supreme Court recognized that the Commonwealth of Puerto Rico had standing to sue in *parens patriae* under the Wagner–Peyser Act and the Immigration and Nationality Act on behalf of its citizens employed as migrant farm workers in Virginia apple orchards. *Alfred L. Snapp & Son,*

*Inc. v. Puerto Rico*, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). *See also New York v. 11 Cornwell Co.*, 695 F.2d 34 (2d Cir.1982) (New York had standing to sue in *parens patriae* for violations of 42 U.S.C. § 1985 on behalf of the mentally disabled), *modified on other grounds*, 718 F.2d 22 (2d Cir.1983) (*en banc*); *Pennsylvania v. Porter*, 659 F.2d 306 (3d Cir.1981) (State had *parens patriae* standing to sue under 42 U.S.C. § 1983 on behalf of victims of police misconduct), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982); *New York v. Operation Rescue Nat'l*, No. 92 Civ. 4884, 1993 WL 405433 at *2 (S.D.N.Y. Oct. 1, 1993) (New York "has *parens patriae* standing to redress conspiratorial civil rights violations directed against its citizens" by seeking an injunction under 42 U.S.C. § 1985(3) prohibiting anti-choice extremists from accosting then Governor Clinton with the remains of a human fetus during the 1992 Democratic National Convention); *New York v. Operation Rescue Nat'l*, No. Civ–92–147A (W.D.N.Y. Apr. 17, 1992) (New York has *parens patriae* standing to secure women's constitutional right to abortion); *Support Ministries for Persons With AIDS v. Village of Waterford*, 799 F.Supp. 272 (N.D.N.Y.1992) (New York had standing to sue in *parens patriae* for persons with AIDS under the Fair Housing Act). In each of these cases the statute the attorneys general sued under did not specifically give them standing.

In *Snapp*, the Supreme Court held that the case law established three requirements for *parens patriae* standing: (a) the state "must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party"; (b) the state "must express a quasi-sovereign interest"; and (c) the State must have "alleged injury to a sufficiently substantial segment of its population." *Snapp*, 458 U.S. at 607, 102 S.Ct. at 3269. I will address these factors in turn.

### 1. Is New York State more than a nominal party?

Defendant contends that Mr. Boardman is the real party in interest and that the State is a nominal party. I find no support for

that position. The complaints seek relief for all hearing impaired New Yorkers, far beyond the needs of Mr. Boardman. The Attorney General brought this suit "to safeguard the health and welfare of the State's residents" and "to prevent discrimination in places of public accommodation...." Complaint at 2. On a motion to dismiss, I must accept as true plaintiff's assertion that it seeks relief for a broad category of its citizens and not just for Mr. Boardman.

State attorneys general have successfully bought many such suits in *parens patriae*. In a comparable case, New York's "profound interest" in protecting possible future victims as well as the specified complainants from racial steering in housing and sexual harassment gave it *parens patriae* standing. *New York v. Merlino*, No. 88 Civ. 3133 (S.D.N.Y. Aug. 18, 1990). New York's *parens patriae* standing has also been upheld when New York clearly declared its interest in nondiscriminatory treatment of its citizens generally as well as particular individuals excluded from a beach club because they were Jewish. *New York v. Ocean Club*, No. 82 Civ. 0790 (E.D.N.Y. Jan. 24, 1984). Most of these cases involved "test-case" litigation. The Attorney General's use of a small group of "aggrieved persons" as exemplars for a larger class is neither new nor objectionable and does not render him a nominal party.

### 2. New York's Quasi Sovereign Interest

The Supreme Court observed that "a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents." *Snapp*, 458 U.S. at 607, 102 S.Ct. at 3269. Plaintiff has alleged that Mid Hudson's denial of interpretive services to its deaf patients threatens the State's interest in the health and well-being of its citizens. Again, I must accept plaintiff's assertion as true, and I cannot imagine that Mid Hudson would deny that the ability of deaf patients to fully communicate with their doctors does not affect the patients' health and well-being. Furthermore, as in *The Ocean Club*, No. 82 Civ. 0790 at 7, New York has unmistakably declared its interest in the nondiscriminatory treatment of its citizens in enacting the civil rights statutes on which plaintiff bases its pendent state claims. For example, in *Operation Rescue*, 1993 WL 405433 (Ward, J.), New York State asserted its interest in protecting women from serious risks to their health and abridgments of their civil rights to justify an injunction against potentially dangerous protests. *Id.* at *2. As here, defendants challenged New York's standing in *parens patriae* on the ground that it "'failed to allege an injury to an interest that is separate from the interests of particular individuals.'" *Id.* at *1 (citation omitted). Judge Ward rejected that argument, noting that in connection with anti-abortion demonstrations "'the health and security of a considerable number of persons was and would be endangered by the demonstrations....'" *Id.* at *2 (citations omitted). The court held that the "State has both the interest and resources necessary to prevent these unlawful practices and protect all of New York's citizens from such unlawful activities." *Id.* I conclude that plaintiff has articulated, as required by *Snapp*, "an interest apart from the interests of particular private parties." *Snapp*, 458 U.S. at 607, 102 S.Ct. at 3268.

### 3. "Substantial Segment" of the Population

Regarding the "substantial segment" prong of the *Snapp* test, Mid Hudson argues that any injury caused by Mid Hudson's failure to provide interpretive services for its hearing impaired patients does not affect a substantial segment of the population of New York State. Plaintiff disagrees citing "the most comprehensive survey of hearing impaired persons ever conducted in the United States," according to which the deaf constituted 5.9% of the population of New York State in 1970. Jerome D. Schein and Marcus T. Delk, Jr., *The Deaf Population of the United States*, National Association of the Deaf, Table II.9 ("Distribution of the Hearing Impaired Population by States: United States, 1971"). More current data supplied by plaintiff suggests that at present the New York deaf population may be as large as 7%. Nationally, the deaf number about 24 million currently, and 2.8 million Americans are speech-impaired. Michael F. Kelleher, Comment, *The Confidentiality of Criminal Con-*

*versations on TDD Relay Systems,* 79 Calif.L.Rev. 1349, n. 2 (1991) (citing S.Rep. No. 116, 101st Cong., 1st Sess. 77 (1989)). I find that hearing impaired New Yorkers constitute a "substantial segment" of the population.

■ In any event, the raw number of individuals directly involved does not determine whether the State has "alleged injury to a sufficiently substantial segment of its population." *Snapp,* 458 U.S. at 607, 102 S.Ct. at 3269. *Snapp* held that "the indirect effects of the injury must be considered" in making this determination. *Id.* The District Court had held that Puerto Rico lacked standing because it felt the loss of 787 temporary jobs directly involved only a small number of individuals and would have a slight impact upon Puerto Rico's economy and population of nearly three million. *Id.* at 599, 102 S.Ct. at 3264–65; *Puerto Rico v. Alfred L. Snapp & Son, Inc.,* 469 F.Supp. 928 (D.C.Va.1979). The Court of Appeals reversed. 632 F.2d 365 (4th Cir.1980). The Supreme Court agreed that the loss of jobs by migrant farm workers sufficed to give Puerto Rico standing.

Several cases in this Circuit have upheld New York's *parens patriae* standing in actions for enforcement of various civil rights statutes benefiting population groups comparable to or smaller than New York's deaf population. In *Cornwell,* the New York Attorney General sued a real estate partnership in *parens patriae* for violations of the 1871 Civil Rights Act, 42 U.S.C. § 1985(3). 695 F.2d at 36. The 11 Cornwell Company had conspired to prevent the State from acquiring a building for use as a home for "eight to ten moderately retarded adults." *Id.* at 39. The Second Circuit held that the eight to ten potential residents of the group home furnished a valid basis for *parens patriae* standing. The effect of an "inability to establish this facility (or others like it, in [the] event of similar conspiracies to discriminate) is to deprive any number of retarded persons of the opportunity to receive rehabilitation." *Id.,* at 39. The court observed that *Cornwell* involved

> not just the few people who would first be moved from institutions or private homes to the residence at 11 Cornwell Street; ... [but also] similar people in years to come ... and the members of the community itself, including the very neighbors who conspired. And, were this kind of incident to be tolerated and left without redress, countless others would be affected.

695 F.2d at 39–40 (citation omitted). The effects of Mid Hudson's alleged discrimination against its seven to ten deaf patients threatens all hearing impaired citizens and perhaps disabled citizens throughout New York.

*Support Ministries,* 799 F.Supp. 272, held that New York's Attorney General had standing in *parens patriae* to sue under the Fair Housing Act, 2 U.S.C. § 3601 *et seq.,* and under 42 U.S.C. § 1983. The Support Ministries, a multi-faith religious charity, alleged that the Village of Waterford, N.Y. unlawfully denied it a zoning permit for a group home for homeless persons with AIDS ("PWAs"). Although the home would house only fifteen PWAs, the court held that the Attorney General had alleged injury to a substantial segment of New York's population because "those initial fifteen PWAs are not the only persons who will be or have been affected by defendants' actions. Rather, also affected are similar PWAs in months and years to come." *Id.* at 277 (citation omitted). The court cited the *Snapp* proposition that states have an interest in securing residents from the "harmful effects of discrimination" *Snapp,* 458 U.S. at 609, 102 S.Ct. at 3270, and relied on "startling statistics" about the number of residents of New York who are HIV positive or have AIDS. *Support Ministries,* 799 F.Supp. at 277–78. The hundreds of thousands of New Yorkers living with AIDS or HIV infection cited in *Support Ministries,* though a tragically large group, is smaller than the six to seven percent of New York's population that is deaf.

### 4. Can Individual Plaintiffs Obtain Complete Relief?

In *Cornwell,* the Second Circuit seems to have added to the *Snapp* test a requirement of a "finding that individuals could not obtain complete relief through a private suit."

*Cornwell,* 695 F.2d at 40.[1] Defendant contends, and plaintiff denies, that plaintiff lacks *parens patriae* standing because Mr. Boardman could obtain complete relief through a private suit. If Mr. Boardman has the resources and stamina necessary for prolonged litigation against Mid Hudson, he might be able to obtain relief through a private suit. However, this litigation does not concern only Mr. Boardman. I conclude that the remote possibility that Mr. Boardman could obtain relief for himself does not preclude the Attorney General from seeking "complete relief" for all current and future deaf patients and their families from Mid Hudson or other health care providers. Mid Hudson argues that the Attorney General is "nothing more than an interloper" who "has no business" asserting an ADA claim. Defendant's Memorandum at 7. I disagree. This case has a much broader scope than the denial of interpretive services to Mr. Boardman and his family.

The requirements of *Snapp v. Puerto Rico* and the Second Circuit cases having been met, I hold that the People of the State of New York have standing to sue Mid Hudson in *parens patriae* to enforce the ADA and Section 504. Plaintiff has met the constitutional standing requirement of Article III by alleging a "sufficient interest in the outcome" of a justiciable "case or controversy," and Mid Hudson's motion to dismiss is denied. *See Snapp,* 458 U.S. at 602, 102 S.Ct. at 3266; *Bramkamp,* 654 F.2d at 215. "It is unquestionable that a state, in its *parens patriae* capacity, does qualify as 'personally ... suffer[ing] some actual or threatened injury,' *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464 [102 S.Ct. 752, 70 L.Ed.2d 700] (1982), which is the only portion of what the Supreme Court has identified as the 'irreducible minimum' of the Article III requirements, *id.,* at issue here." *Maryland People's Counsel v. Federal Energy Regulatory Comm'n,* 760 F.2d 318, 321 (D.C.Cir. 1985) (Scalia, J.).

### III. Is Mid Hudson a Program Receiving Federal Financial Assistance for Purposes of the Rehabilitation Act?

■ Under Section 504 of the Rehabilitation Act:

No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving *federal financial assistance.*

29 U.S.C. § 794 (emphasis added). Defendant contends that the Medicaid and Medicare reimbursements Mid Hudson receives does not constitute "federal financial assistance" ("FFA") for purposes of the Section 504, and thus Section 504 provides no remedy. The parties have not cited, and the court's research has not discovered, any cases supporting this proposition. However, a long line of cases holds to the contrary. *United States v. University Hosp.,* 575 F.Supp. 607, 612–13 n. 5 (E.D.N.Y.1983) (Wexler, J.) (citing cases); *see also United States v. Baylor Univ. Medical Ctr.,* 736 F.2d 1039 (5th Cir.1984).

As did the defendant in *University Hospital,* 575 F.Supp. at 612, Mid Hudson argues that Medicare and Medicaid reimbursement are analogous to payments made under procurement or insurance contracts, which 45 C.F.R. § 84.3(h) expressly declared not to constitute FFA. Mid Hudson cites two distinguishable cases for this proposition. The disabled plaintiff in *Cook v. Budget Rent–A–Car,* 502 F.Supp. 494 (S.D.N.Y.1980) (Ward, J.), alleged discrimination under the Rehabilitation Act when defendant refused to rent him a car. Plaintiff contended that Budget's receipt of government funds under rental contracts constituted FFA. *Id.* at 496. The court disagreed, noting that "assistance" connotes "a transfer of government funds by way of a subsidy, or a sale of government assets at reduced consideration." *Id.* By contrast, Medicare and Medicaid, funded by payroll taxes—not insurance premiums, re-

---

**1.** One year before *Snapp* and *Cornwell,* the Second Circuit noted that "a state seeking to proceed as parens patriae need not demonstrate the inability of private persons to obtain relief if parens patriae standing is otherwise indicated." *Puerto Rico v. Bramkamp,* 654 F.2d 212, 217 (2d Cir.1981).

imburse Mid Hudson for services it provides to poor and elderly persons entitled to those services by statute. *University Hospital,* 575 F.Supp. at 613. This is just the sort of "assistance" meant to trigger Section 504's non-discrimination obligations.

Mid Hudson also cites the equally inapposite *Lemmo v. Willson,* 583 F.Supp. 557 (D.Colo.1984), in which the defendant admitted that one of its programs received FFA under the Comprehensive Employment and Training Act ("CETA"). The court held that plaintiff lacked standing because the particular program which he claimed discriminated against him had not received the CETA funds. *Id.* at 560. Mid Hudson does not claim that it has multiple "programs" or "activities," and that its deaf patients do not participate in those that receive FFA. As in *University Hospital,* 575 F.Supp. at 613, the activity which plaintiff contends is being "conducted in a discriminatory manner is the provision of medical services, the very activity which the Medicaid and Medicare programs were designed to foster."

## IV. *The Rule 8 and Lack of Supplemental Jurisdiction Motions*

I deny Mid Hudson's motion to dismiss plaintiff's federal claims under Federal Rule of Civil Procedure 8 because I found above that plaintiff alleged sufficient jurisdictional facts to establish *parens patriae* standing. Finally, because I have declined to dismiss the federal claims that give me supplemental jurisdiction over the New York claims, defendant's motion with respect to the pendent claims must be denied. 28 U.S.C. § 1367; *see also United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## V. *The Motion to Compel*

■ I turn now to Mid Hudson's letter brief, dated December 7, 1994, requesting an order compelling production of eleven transcripts of telephone conversations held between Mr. Boardman, and Assistant Attorney General ("AAG") Michael A. Schwartz, counsel for plaintiff, using a "TTY machine." The term, "TTY," also known as "TDD," is short for "teletypewriter for the deaf." This

machine enables a hearing impaired person to utilize the telephone. *See* 47 U.S.C. § 225(a)(2); *State of Wisconsin v. Rewolinski,* 159 Wis.2d 1, 464 N.W.2d 401, 402, n. 1 (1990). Mr. Schwartz's TTY includes a printer that prints a conversation *verbatim* after its conclusion. Plaintiff opposed this motion by letter brief dated January 17, 1995, arguing that such printouts constitute attorney work product.

■ We have failed to unearth any precedent on the application of the work product doctrine to TTY transcripts. Generally, material prepared by an attorney in anticipation of litigation is the work product of the attorney and can be discovered by opposing counsel only in limited circumstances. *Hickman v. Taylor,* 329 U.S. 495, 513, 67 S.Ct. 385, 394–95, 91 L.Ed. 451 (1947). The Federal Rules of Civil Procedure allow discovery of attorney work product

> only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Fed.R.Civ.P. 26(b)(3). *See e.g., A. Michael's Piano, Inc. v. Federal Trade Comm'n,* 18 F.3d 138, 146 (2d Cir.1994); *Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989). However, Mid Hudson has not articulated a "substantial need" for the material. Nor has it made any showing that it is unable to obtain "the substantial equivalent of the materials by other means."

■ Mid Hudson claims that the transcripts "related to the factual events regarding [Mr. Boardman's] position that [Mid Hudson] should furnish him with a sign interpreter...." Defendant's letter, at 2. Plaintiff asserts that the conversations contained in the eleven printouts relate to Mr. Boardman's complaints that Mid Hudson violated federal and state civil rights laws. The two positions are not inconsistent. I find that it would be very hard for Mr. Boardman and Mr. Schwartz not to discuss factual events without also discussing the legal aspects of Mid Hudson's position. While Mr. Boardman was not Mr. Schwartz's client, Mr.

Boardman's deposition testimony indicates that they discussed potential litigation through the TTY. Mr. Schwartz says that in communicating with Mr. Boardman he sought to ascertain the strength of a lawsuit against Mid Hudson. Plaintiff convincingly argues that the printouts are the equivalent of handwritten notes prepared by a hearing attorney of a conversation with a potential witness in upcoming litigation. In the course of speaking with the complainant, Mr. Schwartz says that he articulated his thought processes and strategy through the questions he posed. Mid Hudson does not dispute this contention and I accept it as true.

The Second Circuit has construed the anticipation of litigation concept liberally. In *Republic Gear Co. v. Borg–Warner Corp.,* 381 F.2d 551 (2d Cir.1967), documents prepared by a nonparty attorney who represented a Brazilian corporation in prior litigation were held protected from disclosure to counsel for the plaintiff in subsequent litigation. The Second Circuit rejected plaintiff's argument that the work product doctrine was unavailable because the documents were not prepared specifically for the pending litigation. *Id.* at 557. In this case, Mr. Schwartz prepared the transcripts specifically for the instant action.

Mid Hudson contends that the telephone printouts were "prepared in the ordinary course of business," and therefore are not protected "even if the party is aware that the document may also be useful in the event of litigation," citing *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 471 (S.D.N.Y.1993). Defendant's letter, at 2. However, conversations between Mr. Schwartz and a complainant about a potential violation of law occurred in "the ordinary course of business" only to the extent that the anticipation of litigation is Mr. Schwartz's "business." I find that the TTY conversations between Mr. Schwartz, acting in his capacity as an AAG investigating a complaint of a civil rights violation, and Mr. Boardman were made in anticipation of litigation. As documents prepared principally or exclusively to assist in anticipated or ongoing litigation, they constitute Mr. Schwartz's work product and are protected from disclosure.

*Hardy v. New York News, Inc.,* 114 F.R.D. 633, 644 (S.D.N.Y.1987); *see* 8 Charles A. Wright & Arthur Miller, Federal Practice and Procedure: Civil 2d § 2024 at 343 (1994). The printouts were certainly recorded "with an eye to litigation," and as such, are protected work product. *Hickman,* 329 U.S. at 511, 67 S.Ct. at 393–94; *A. Michael's Piano,* 18 F.3d at 146.

I find that the content and sequence of the questions could reveal to opposing counsel Mr. Schwartz's thought processes and strategy, a danger recognized and forestalled by the *Hickman* rule. To adopt a rule that would subject the printouts of TTY conversations with the complainant to disclosure, without a showing of substantial need, would instill a fear in hearing impaired litigants that their thoughts and information will be invaded by adversary counsel through the TTY record.

To communicate by telephone with hearing persons who do not have TTY machines, the deaf rely on TTY "relay operators" to translate their written TTY messages. The ADA amended the Communications Act of 1934 to prohibit such "relay operators from disclosing the content of any relayed conversation and from keeping records of the content of any such conversation beyond the duration of the call." 47 U.S.C. § 225(d)(1)(F). By doing this Congress attempted to protect the confidentiality of TTY communications in situations where people not using assistive device technology often take confidentiality for granted. A lawyer who takes notes on a phone call with a potential witness in preparation for litigation fully expects those notes to be protected from discovery. Deaf lawyers who communicate with such witnesses through a TTY machine do not need to take notes because the machine transcribes the conversation so they can read it rather than hear it. Hearing impaired lawyers deserve the same expectation of confidentiality as hearing lawyers. To hold otherwise would sanction opposing counsel's eavesdropping on TTY conversations between lawyers and their witnesses in anticipation of litigation.

## VI. *CONCLUSION*

For the reasons set forth above, defendant's motions to dismiss the complaint and

the supplemental complaint, and to compel the production of documents are denied in all respects.

**SO ORDERED**