COMMONWEALTH OF
MASSACHUSETTS,
Plaintiff,

v.

BULL HN INFORMATION SYSTEMS,
INC., Defendant.

Civ. No. 97–11326–NG.

United States District Court,
D. Massachusetts.

Aug. 7, 1998.

Catherine C. Ziehl, Attorney General's Office, Boston, MA, for Plaintiff.

Joan A. Luckey, Robyn B. Klinger, Michael G. Bongiorno, Karen Katz, Hale & Dorr, Boston, MA, for Defendant.

## TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

II. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
 A. Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
 1. Parens Patriae Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
 a. Parens Patriae Generally. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
 b. Quasi-Sovereign Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
 c. Affected State Population: The "Substantial Segment" Test . . . . . . . . . . . 98
 d. The Availability of Private Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
 e. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
 2. EEOC's Parallel Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
 3. Article III and Statutory Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
 4. The Requirement of Named Individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
 B. Procedural Requirements of the OWBPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
 C. Failure to State a Claim upon which Relief can be Granted . . . . . . . . . . . . . . . . 105
 1. The Commonwealth's OWBPA Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
 2. The Sears Line of Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
 3. Counts I, IV, and V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
 a. Count I: OWBPA § 626(f)(4): Interference with Right to File a Charge with the Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
 b. Count IV: Unlawful Employment Practices under the ADEA § 623(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
 c. Count V: Retaliation under ADEA § 623(d) . . . . . . . . . . . . . . . . . . . . . . 108
 (1) "Threatening" Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
 (2) Enforcement of Waivers as Retaliation . . . . . . . . . . . . . . . . . . . . . . . 109
 4. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

### MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION TO DISMISS

GERTNER, District Judge.

The Commonwealth of Massachusetts ("the Commonwealth") filed this age discrimination action on June 12, 1997, asserting five counts under the Older Workers Benefit Protection Act (OWBPA) and the Age Discrimination in Employment Act (ADEA). On September 8, 1997, Defendant Bull HN Information Systems, Inc. ("Bull") moved to dismiss on a number of different theories. [docket # 6]. For the reasons set forth below, the defendant's motion is **DENIED.**

### I. *BACKGROUND*

Bull, a company engaged in advanced technology, employed approximately 4,500 people in Massachusetts as of December, 1988. Since that time, Bull has reduced its Massachusetts workforce by over 3,000 employees.

Several former Bull employees, laid off pursuant to the company's workforce re-duction program, filed age discrimination complaints with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD"). In 1993, the Massachusetts Attorney General initiated an investigation into Bull's employment practices, and in July of that year, informed Bull that it intended to file an age discrimination complaint against the company. On July 25, 1994, the Attorney General intervened in a complaint filed against Bull with the MCAD, alleging that Bull was engaged in a pattern and practice of age discrimination, and that older employees had been disproportionately affected by the layoffs between 1990 and 1994.

Prior to the Attorney General's investigation, Bull had a longstanding severance pay plan in effect that offered one week of base pay for each year of service to certain employees who were laid off. Bull revised this severance plan effective July 5, 1994, after the Attorney General's investigation had be-

gun. Under the new plan, laid off employees were required to sign a waiver of rights, including ADEA rights, before receiving any severance pay. This "General Release and Severance Agreement" provided that in exchange for receiving severance benefits, an employee gives up the ability to sue Bull for any current or prior claims arising out of the employee's employment with Bull. The amount of severance pay under the new plan did not change.

The severance plan further provided that if an employee who executed a release later brought or maintained any claim covered by the agreement, he or she would be required to return all severance paid and would have to indemnify Bull for all attorneys fees, costs and expenses associated with defending the complaint or claim.

In July 1994, over fifty more employees were laid off, pursuant to an employment termination program within the meaning of section 626 of the OWBPA. Affected individuals were given the revised release and severance agreement.

In May of 1996, the Attorney General filed a complaint against Bull with the EEOC alleging that the waivers violated the OWBPA. In a June 19, 1996, "determination," the EEOC concluded that there were reasonable grounds to believe that Bull's waivers violated the OWBPA. As required by the ADEA, the EEOC attempted to conciliate the matter informally. However, in a letter dated July 16, 1996, the EEOC informed both Bull and the Attorney General that the conciliation efforts were unsuccessful and that "[n]o further efforts to conciliate this case will be made." The letter concluded, "we are at this time forwarding the case to the Regional Attorney for possible litigation."

On May 13, 1997, the EEOC, at the Attorney General's request, sent the Attorney General a "notice of right to sue" form. The form indicated that the EEOC was continu-ing its handling of the claim, but that the Attorney General could file its own ADEA suit in court if it so desired. The letter was received by the Attorney General's office, but, apparently, because of an error in the address, was never received by Bull. The Commonwealth filed this action shortly thereafter, alleging five counts under the ADEA and OWBPA.[1]

The EEOC has filed a separate lawsuit against Bull, on largely the same grounds, seeking largely the same relief. The EEOC's lawsuit was filed on the same day— approximately nineteen minutes later—as the one filed by the Commonwealth.

## II. *DISCUSSION*

For the purposes of this motion to dismiss, I will accept as true all of the allegations in the complaint and draw inferences from these allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Northeast Doran, Inc. v. Key Bank of Maine,* 15 F.3d 1, 2 (1st Cir.1994). Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Estate of Soler v. Rodriguez,* 63 F.3d 45, 53 (1st Cir.1995).

Bull presented three main grounds on which to dismiss the Commonwealth's action. First, Bull argues that, for various reasons, the Commonwealth has no standing to bring this action. Second, Bull asserts that the Commonwealth failed to comply with the procedural requirements for asserting a claim under the OWBPA. Finally, Bull maintains that the Commonwealth fails to state a claim upon which relief can be granted. I find none of Bull's arguments persuasive.

---

1. The five counts in the Attorney General's complaint can be summarized as follows:
 1. OWBPA § 626(f)(4): Chilling effect on filing of complaint or claim.
 2. OWBPA § 626(f)(1)(F)(ii) and (f)(1)(H): Failure to comply with reporting requirements and 45 days of consideration for waivers.

 3. OWBPA § 626(f)(1)(D)(ii): Failure to provide additional consideration for waiver.
 4. ADEA § 623(a): Unlawful employment practices.
 5. ADEA § 623(d): Retaliation.

### A. *Standing*

Bull offers several reasons why the Commonwealth has no standing to bring this action. It: a) disputes the Commonwealth's invocation of its inherent "parens patriae" powers to act in the interests of its citizens; b) asserts that the parallel lawsuit brought by the EEOC precludes this one; c) contends that the Attorney General is not a "person aggrieved" under the ADEA and that he fails to meet Article III's constitutional standing threshold; and, d) argues that a government entity cannot bring an ADEA action without naming specific former employees who have been injured by Bull's conduct. These arguments will be discussed in turn.

### 1. *Parens Patriae Standing*

### a. *Parens Patriae Generally*

Parens patriae literally means "parent of the country," and refers traditionally to the role of the state as sovereign and guardian of persons under legal disability. *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982); *see also* 3 William Blackstone, Commentaries *47 (the sovereign is the "general guardian of all infants, idiots, and lunatics") *cited in Hawaii v. Standard Oil Co.,* 405 U.S. 251, 257, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Over time, the meaning of the doctrine has evolved, and parens patriae has become a different and far broader sovereign power. *See Snapp,* 458 U.S. at 600, 102 S.Ct. 3260; *Minnesota v. Standard Oil Co.,* 568 F.Supp. 556, 562 (D.Minn.1983). Today, it is a concept of standing utilized to allow the state to protect "quasi-sovereign" interests such as the health, comfort, and welfare of its citizens, interstate water rights, and the general economy of the state. *Snapp,* 458 U.S. at 602–07, 102 S.Ct. 3260.

The Supreme Court in *Snapp* articulated the circumstances under which a state has parens patriae standing to bring an action under federal law. *See Snapp,* 458 U.S. at 607–08, 102 S.Ct. 3260. In *Snapp,* the Com-

monwealth of Puerto Rico filed suit against Virginia apple growers, alleging that they violated federal labor and immigration laws designed to give U.S. workers, including citizens of Puerto Rico, preference over temporary foreign workers. Puerto Rico alleged that the apple growers had discriminated against Puerto Rican workers in violation of these statutes, and sought declaratory and injunctive relief. *Id.* at 597–99, 102 S.Ct. 3260.

■ The Supreme Court found that Puerto Rico had parens patriae standing to maintain the suit. *Id.* at 608–10, 102 S.Ct. 3260. Later courts and commentators have distilled the Court's analysis into two parts. First, the state must assert an injury to a "quasi-sovereign" interest, an interest apart from the interests of particular private parties. Second, the state must allege injury to a "substantial segment" of its population.[2] The Second Circuit further interpreted *Snapp* to require a finding that individuals could not obtain complete relief through a private suit. *See People v. 11 Cornwell Co.,* 695 F.2d 34, 40 (2d Cir.1982). The First Circuit has never addressed the question of parens patriae standing under the *Snapp* factors.

### b. *Quasi–Sovereign Interests*

■ According to the *Snapp* Court, quasi-sovereign interests consist of a set of interests that the State has in the well-being of its populace. However, they must be sufficiently concrete to create an "actual controversy" between the State and the defendant. *Snapp,* 458 U.S. at 602, 102 S.Ct. 3260.

Although the Court noted that the articulation of these interests was a matter for case by case development and did not lend itself to either exhaustive definition or a definitive list, it was able to identify certain basic characteristics. *Id.* at 607, 102 S.Ct. 3260. First, a state has a quasi-sovereign interest in the health and well-being, both physical and economic, of its residents in general. Pointedly, the Court recognized a state interest in pro-

---

2. The Supreme Court did not explicitly set these out as two discrete inquiries; they have emerged from the application of *Snapp* to cases in the lower courts. As a result, some courts have articulated the tests somewhat differently. *See People v. Peter & John's Pump House, Inc.,* 914 F.Supp. 809, 812 n. 2 (N.D.N.Y.1996). The relevant considerations, however, are the same.

tecting its residents from the "harmful effects of discrimination." *Id.* at 609, 102 S.Ct. 3260.

Second, a State has a quasi-sovereign interest in not being denied its rightful status within the federal system. The State should be permitted to ensure that it and its residents are not excluded from the benefits of participation in the federal system, and "need not wait for the Federal Government to vindicate" its interests. *Id.* at 608, 102 S.Ct. 3260. Thus, while the State must be more than a nominal party, it has "an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." [3] *Id.*

The *Snapp* Court found that Puerto Rico had a cognizable quasi-sovereign interest under either formulation. *Id.* The Court noted its experience with the "political, social, and moral damage of discrimination" in holding that the State has a substantial interest in protecting its citizens from its evils. *Id.* at 609, 102 S.Ct. 3260. Even if the financial effect of the discrimination was limited, and the number of workers directly at issue small, the Court declared that "deliberate efforts to stigmatize the labor force as inferior carry a universal sting." *Id.*

■ Post–*Snapp* courts have generally interpreted the health and well-being category of quasi-sovereign interests broadly, particularly where the state has made an allegation of unlawful discrimination. It seems indisputable that a state has a quasi-sovereign interest in preventing racial discrimination of its citizens. *See People v. Peter & John's Pump House, Inc.*, 914 F.Supp. 809, 812 (N.D.N.Y.1996). Similarly, courts have found a quasi-sovereign interest in prevent-

ing discrimination against other protected or disadvantaged groups, such as the mentally handicapped, *11 Cornwell*, 695 F.2d at 39, or persons with AIDS. *Support Ministries for Persons with Aids, Inc. v. Waterford*, 799 F.Supp. 272, 277 (N.D.N.Y.1992).

■ A state also has a quasi-sovereign interest in preventing any injury or potential injury to the general health and well-being of its residents. *See, e.g., Support Ministries*, 799 F.Supp. at 277–78 (state has a quasi-sovereign interest in challenging a town's altered zoning law denying permit for residence for homeless AIDS sufferers, because conduct threatened physical health and well-being of home's potential residents). This is no less true where the alleged harm is economic rather than physical in nature. *See People v. Hemingway*, 39 B.R. 619, 622 (N.D.N.Y.1983) (state Attorney General has parens patriae standing to challenge dischargeability of debt in bankruptcy proceeding on behalf of six named consumers, because state has quasi-sovereign interest in protecting economic well-being of its citizens from consumer fraud).

The *Snapp* Court further found that Puerto Rico had parens patriae standing under the second category of quasi-sovereign interest: to pursue the interests of its residents in the Commonwealth's full and equal participation in the employment scheme established by federal law. *Snapp*, 458 U.S. at 609–10, 102 S.Ct. 3260. Just as it had the right to address the problem through legislation of its own, Puerto Rico had the right to seek for its residents the full benefit of federal laws designed to deal with those problems. *Id.* at 608–09, 102 S.Ct. 3260. *See also Standard Oil*, 568 F.Supp. at 564 (state can recover for overcharges of its citizens for

---

**3.** Of the eight justices who participated in the case, three joined a concurrence authored by Justice Brennan. (No justices dissented.) Justice Brennan's concurrence articulated an even more expansive interpretation of state interests. First, he noted that the prerogative of a state to bring suit in federal court to enforce a federal right for its citizens should be commensurate with the ability of a private organization to bring suit on behalf of its members. *Id.* at 611–12, 102 S.Ct. 3260. Second, Justice Brennan argued that courts should allow states to assess their own interests as sovereign entities, and absent

conflict with the Constitution or overriding federal law, courts should not superimpose their judgment on that of a state with respect to the substantiality or legitimacy of a state's assertion of its sovereign interests. *Id.* at 612, 102 S.Ct. 3260. Some courts have noted that half of the *Snapp* Court thus sought an even broader formulation of parens patriae standing and should defer to a state's analysis of its own interests. *See, e.g., Standard Oil*, 568 F.Supp. at 564; Wright, Miller & Cooper, 13A *Federal Practice and Procedure* Jurisdiction 2d § 3531.11. *See also* n. 5, *infra.*

petroleum products, where the prices charged allegedly violated federal regulations).[4]

I find that the Commonwealth has articulated a sufficient interest in the subject matter of this dispute for standing purposes. Indeed, the Commonwealth's quasi-sovereign interest can be demonstrated under either formulation of the *Snapp* inquiry: the health and well-being of its residents, or the state's full participation in a federal scheme.

The subject matter of this litigation implicates the general well-being of the Commonwealth's residents, particularly with regard to the Commonwealth's allegation of unlawful discrimination against its residents. The Commonwealth alleges that Bull discriminated against older workers by requiring that they waive ADEA rights in exchange for severance pay when younger workers, who are not covered by the ADEA, received the same severance without waiving these rights. Moreover, the Commonwealth alleges that Bull is using the waivers to protect itself against claims of age discrimination, and to chill the Attorney General's investigation. The circumstances of this case are similar to those in *Snapp*, where the efforts to stigmatize the Puerto Rican labor force carried a "universal sting," and, *11 Cornwell*, where the state's interest in ensuring equal protection under housing laws for the retarded was sufficient for parens patriae purposes. Discrimination of any kind, whether based on age, race or handicap, corrodes the social fabric and fosters intolerance and inequality. It is unambiguously in the interest of the state to stop it in its tracks.

The state's interest in this matter is even more obvious under the second *Snapp* formulation, that of the state's interest in ensuring for its residents full participation in a federal scheme. Here, the Attorney General is seeking to protect its residents' participation in the federal age discrimination scheme, a situation closely analogous to that in *Snapp*.

■ The Commonwealth's interest is particularly compelling in light of the critical fact of this case: that the waivers at issue discourage individuals from seeking redress on their own behalf. Where individuals are curtailed from making use of the courts to address violations of federal law on their own behalf, the state's interest in stepping in to protect them is greater. *See Standard Oil*, 568 F.Supp. at 564 (parens patriae standing is particularly appropriate where parties are unlikely to sue alleged violators themselves). Given the punitive nature of the waivers here, it is unlikely that most signatories to the waivers would be able to effectuate relief absent the state's involvement.

This alone suggests that the Commonwealth has stated an interest above and apart from the interests of the individuals who have signed the waivers. This conclusion is buttressed by the Commonwealth's allegation that Bull's waiver plan was designed to restrict the flow of information to the Attorney General's investigation into Bull's employment practices—an investigation that was already underway when Bull put the new waivers into effect.

I find that the Commonwealth has an adequate interest in the subject matter of this lawsuit to permit parens patriae standing.[5]

### c. *Affected State Population: The "Substantial Segment" Test*

■ The second inquiry under *Snapp* is whether a sufficiently numerous portion of the state's population is affected by the challenged conduct. *See Snapp*, 458 U.S. at 607, 102 S.Ct. 3260. This element is not conceptually distinct from the requirement that the state demonstrate a quasi-sovereign interest: both categories ensure that the state is not standing in for individuals in an essentially

---

4. The *Standard Oil* court added that parens patriae authority was particularly appropriate in light of the fact that most of the overcharges were so minor that few private citizens would attempt to pursue their own actions. In other words, the court suggested that a state's quasi-sovereign interest in enforcing federal law is greater where it is less likely that its citizens will seek to enforce those laws themselves. *Id.*

5. Moreover, I take note that half the participating judges in the *Snapp* decision would have me defer to the state's own assessment of its interests in bringing an action under its parens patriae powers. *See Snapp*, 458 U.S. at 610–612, 102 S.Ct. 3260 (Brennan, J., concurring).

private dispute. The caselaw on this question is somewhat ambiguous. However, at this juncture, given the breadth of the Supreme Court's language and taking into account the indirect effects of Bull's alleged conduct, I conclude that the Commonwealth has shown that an adequate portion of the state's population could be affected by Bull's actions.

The *Snapp* Court refused to set a definitive numerical threshold for the proportion of the population that must be adversely affected in order for the state to have standing. "Although more must be alleged than injury to an identifiable group of individual residents," the Court noted, the indirect effects of the challenged behavior must be considered along with the direct effects. *Id.* Declining to focus exclusively on the 787 jobs at issue, the Court examined the important state interests in protecting its residents from discrimination, and found that the "universal sting" of the challenged conduct stigmatized the entire Puerto Rican labor force. *Id.* at 609, 102 S.Ct. 3260. Since the challenged conduct indirectly affected virtually all Puerto Ricans, the state had demonstrated an impact on a sufficient segment of the population for standing purposes.

The Second Circuit's decision in *11 Cornwell* is consistent with an expansive interpretation of the "indirect effects" inquiry. 695 F.2d at 38–40. In *11 Cornwell,* the court found that the defendant's actions in blocking the creation of a group home for eight to ten retarded adults did affect a substantial portion of the state population.[6] The court "start[ed] with the obvious proposition that the defendant's actions affect more than any particular retarded persons's interest in residing at 11 Cornwell Street." *Id.* at 39. The court proceeded to describe a variety of effects of the defendant's alleged conduct: the deprivation to "any number" of retarded persons of the opportunity to receive rehabilitation; the effect on "countless others" if this kind of discrimination were to be tolerated; the effect on retarded individuals living in institutions that would be more crowded as

a result; the inability of all persons to live in integrated communities in which retarded and non-retarded persons could live together; and the effect on the state taxpayers who would be forced to bear the higher cost of traditional institutionalization. *See id.* at 38–40. In other words, the *11 Cornwell* court interpreted what would appear to be an injury to a small group of people in the broadest possible terms.

Other courts have followed suit. *See Pump House,* 914 F.Supp. at 812–13 (noting that the raw number of persons directly involved is not determinative of the issue). In *Pump House,* the state sued a nightclub under federal and state anti-discrimination law, alleging a policy of refusing admission to African–Americans on the basis of race. The complaint itself only contained allegations regarding sixteen named individuals who had been refused admission or otherwise subject to discrimination at the club. Noting that there is no "numerical talisman to establish parens patriae standing," the court agreed with the state that the instances described in the complaint were merely "illustrative examples" of a broader pattern of conduct that affected all African–Americans as well as the general fabric of society. *Id.*

Likewise, in *Support Ministries,* the state attempted to challenge alleged discrimination against a planned group home for homeless persons suffering from AIDS. 799 F.Supp. at 277–78. The court discussed at length the problem of HIV-infection and the rise of AIDS in the homeless population. Discrimination against the small group of persons who would have been housed at the facility was imputed to affect all homeless persons with AIDS in the state. The court also noted the effects of the conduct on all members of the community that flowed from the discriminatory conduct, including the effect on those who rallied against the group home. *Id.* at 277.

The substantial segment test received particularly expansive treatment in *People v. Mid Hudson Medical Group,* 877 F.Supp. 143, 147–48 (S.D.N.Y.1995). There, the state

---

**6.** The defendant, 11 Cornwell Company, was a partnership of neighbors who, upon learning of the state's plans to purchase a neighborhood house for use as a group home for the mentally retarded, purchased the house and refused to sell it to the state.

sued a hospital claiming that its practice of refusing to provide sign language interpreters for deaf patients violated state and federal anti-discrimination laws. The complaint included an allegation of conduct with regard to one patient only; the court noted that there were approximately seven to ten deaf patients at the hospital overall. However, the court pointed out that deaf Americans number about 24 million, and that about 7% of the state's population could be described as hearing impaired. The court found that hearing impaired New Yorkers constituted a sufficiently substantial segment of the population for parens patriae standing to be appropriate. *Id.* at 147–48. As in *Support Ministries,* the court focused on the entire state deaf population, and not the number of deaf patients at that hospital that had been or could be affected directly by the defendant's conduct. According to the court, "[t]he effects of Mid–Hudson's alleged discrimination against its seven to ten deaf patients threatens all hearing impaired citizens and perhaps disabled citizens throughout New York." *Id.* at 148.

The *Mid–Hudson* court also suggested that cases like *11 Cornwell* and *Support Ministries* stood for the proposition that courts should consider what would happen if allegedly illegal conduct were permitted to continue without the state's intervention. Under this analysis, a court should consider not just the individuals directly affected by the defendant's conduct, but all similarly situated individuals who might be subject to similar discrimination if it were to be tolerated. *See 11 Cornwell,* 695 F.2d at 39–40 ("were this kind of incident to be tolerated and left without redress, countless others would be affected"); *Hemingway,* 39 B.R. at 622 (finding parens patriae standing after "fully considering the future impact that an adverse decision to the State would have").

■ In short, the case law suggests that the "substantial segment" test is to be interpreted broadly indeed. *See also Hemingway,* 39 B.R. at 622 (state's intervention on behalf of six named consumers was appropriate because "it must not be overlooked that such representation is part of a much broader scheme of consumer protection"); *New York v. DeFelice,* 77 B.R. 376, 380 (Bankr. D.Conn.1987) (state's intervention in bankruptcy proceedings impacts substantial segment of state because state's interest "is directed at the vindication of New York's consumer protection laws for all of its citizens").[7]

Applying these standards here, I find that the Commonwealth has demonstrated that a sufficiently substantial segment of the population will be affected by Bull's alleged conduct for the Commonwealth to have parens patriae standing.

With approximately 50 allegedly invalid waivers of ADEA rights at issue, the "direct effects" of Bull's conduct may or may not be sufficient.[8] In any case, the "indirect ef-

7. Only one case suggests otherwise. In *New York v. Holiday Inns, Inc.,* 656 F.Supp. 675 (W.D.N.Y.1984), the state Attorney General's office brought an action under the ADEA, Title VII and state law, alleging that the defendants had engaged in age and gender discrimination in the hiring and termination of employees at various hotels in the state. Defendants moved to dismiss the Attorney General on standing grounds, arguing that the state had failed to allege injury to a substantial segment of the population. The district court agreed. *Id.* at 677–78. The court explicitly rejected the state's argument that the indirect effects of the injury—that younger workers and customers would be deprived of the opportunity to work with or be served by employees of all ages—were sufficient to make out a showing of parens patriae standing.

*Holiday Inns* has been criticized. For example, the *Pump House* court explicitly declined to follow the analysis in *Holiday Inns,* finding it inappropriately narrow in light of circuit precedent. 914 F.Supp. at 812–13. The *Pump House* court also distinguished the case because in *Holiday Inns,* an employment discrimination case, plaintiffs could use hiring and discharge records to identify private plaintiffs, and thus, private plaintiffs would have been able to seek relief on their own. *Id.* at 813. In *Pump House,* by contrast, identification of plaintiffs would be difficult, and whatever potential plaintiffs could be found would be unlikely to seek redress on their own. As described below, the latter is also true here.

8. One court suggested that the state's intervention on behalf of fifty-five persons was appropriate because that number represented a substantial segment of the state's population. *In re Volpert,* 175 B.R. 247, 257 (Bankr.N.D.Ill.1994) ("It is not just a few isolated instances that are complained of. On the face of the pleading, fifty-

fects" of Bull's conduct are in a different category. They affect or could affect a broad portion of the state's population.

It is important to bear in mind that the Commonwealth has alleged more than just non-compliance with the waiver provisions of the OWBPA. The Commonwealth has alleged that the implementation of the waivers in 1994 was a response to several age discrimination complaints by Bull employees, and to an investigation into these allegations initiated by the Attorney General's office. The Commonwealth alleges that the waivers were designed to "chill" both its own investigation as well as private efforts to expose alleged age discrimination. Moreover, the Commonwealth alleges that the waivers themselves are inherently discriminatory: they require older workers to give up greater rights for the same consideration as younger workers. Thus, when analyzing the effects of Bull's conduct, I must consider not just the waivers themselves but the alleged age discrimination that the waivers were designed to protect from legal scrutiny.

If Bull is discriminating against older workers, and using the waivers to insulate itself from the consequences of that discrimination, its conduct "stings" all older workers in the same way that all Puerto Ricans were stigmatized in *Snapp*. *See also Pump House*, 914 F.Supp. at 813 ("The State alleges discrimination that has a destructive societal effect justifying parens patriae standing.").

Moreover, the cases instruct that I am to infer what might arise if the defendant's conduct is left unchallenged by the state. *See 11 Cornwell*, 695 F.2d at 39–40; *Hemingway*, 39 B.R. at 622. Bull's waivers contain powerful disincentives against individual challenges: the repayment of, and the loss of rights to, severance pay and the indemnifica-

tion of Bull for the fees and costs of defending the action. Few older workers, particularly those approaching retirement age, will be in a position to embark upon such a risky venture. If the Attorney General is barred from pursuing this action on standing grounds, the waivers would be functionally immunized from legal challenge. Other employers in the Commonwealth could learn that punitive waiver provisions of this kind can be used as an end-run around the protections of the OWBPA.[9] Such a bleak state of affairs has the potential to impact all workers who fall under the protections of the ADEA, a sizable percentage of the state's work force.

### d. *The Availability of Private Relief*

■ The Second Circuit has interpreted *Snapp* to hold that parens patriae standing is inappropriate if individuals could obtain complete relief through a private suit. *See 11 Cornwell*, 695 F.2d at 40. In many courts—indeed, in the pleadings in this motion—this is treated as the third of three prerequisite inquiries to a finding of parens patriae standing.[10]

■ This "requirement" is no more than another formulation of the general parens patriae standing consideration that the state be more than a nominal party in a private dispute. *See Pump House*, 914 F.Supp. at 813 n. 3 ("if the state has no quasi-sovereign interests apart from the interest of private individuals, who can obtain complete relief through their own litigation, then no parens patriae standing exists")

First, courts typically find that this requirement is satisfied when the relief sought by the state is broader than that which would be sought by private litigants. A state generally seeks broad injunctive or declaratory relief, while an individual seeks money dam-

---

five directly injured investors could well constitute a 'sufficiently substantial' segment of the State's population."); *see also In re Taibbi*, 213 B.R. 261, 271 (Bankr.E.D.N.Y.1997) ("As OCA has received sixty-four complaints, it contends that it has satisfied the requirement that a substantial segment of its citizens are involved. The Court agrees.").

9. The EEOC's involvement in a parallel action against Bull does not undermine this analysis.

Just as the enforcement of federal law cannot depend on the limited resources of private parties, *see Pump House*, 914 F.Supp. at 813, so too the EEOC's priorities and resource allocation may not necessarily serve the Commonwealth's interests.

10. The First Circuit has not adopted such a precondition for a finding of parens patriae standing.

ages or a narrowly tailored injunction. *See id.*, at 813. Thus, even though some individuals could conceivably obtain private relief, this requirement is satisfied if the state is seeking broader relief. *Support Ministries,* 799 F.Supp. at 278 ("it is conceivable that a private action by Support Ministries may not produce complete relief for all of the persons injured"); *Mid Hudson,* 877 F.Supp. at 149 ("remote possibility" that one individual may seek relief for himself does not preclude Attorney General from seeking "complete relief" for all current and future deaf patients).

Similarly, courts express concern where public rights are subject to the particularized pressures that drive private litigation. *See Pump House,* 914 F.Supp. at 813 ("it is relevant that private litigants might not have the tenacity or fortitude to sue the Club."). As one court put it, "the vindication of the rights of New Yorkers to be free from discrimination cannot be made dependent on the actions and potentially limited resources of private parties." *Support Ministries,* 799 F.Supp. at 278–79. Finally, at least one case predicated a finding of parens patriae standing in part on the fact that individuals were unlikely to bring private suits because of the small amount of damages suffered by each of them. *Standard Oil,* 568 F.Supp. at 564.

As is true in most cases, this requirement poses no meaningful obstacle here. The Attorney General is seeking broad injunctive and declaratory relief of a kind that individual litigants likely would not attempt to seek. Moreover, the concern for predicating the vindication of public rights on the limited resources of private plaintiffs is no less pressing here than in other contexts. Finally, and most persuasively, the waivers themselves strongly militate against private suits. Simply by bringing an action against Bull, a private litigant is subject to severe penalties. This case by its very nature presents a situation where individuals face substantial hurdles and disincentives in their efforts to seek private relief. Public intervention is consequently appropriate.

### e. *Conclusion*

In sum, I find that the Commonwealth has alleged sufficient facts to establish parens patriae standing in this suit. Although some of the questions are close, this is not a situation where the Commonwealth is seeking to intervene in an essentially private dispute. *See, e.g., Secretary of Labor, Com. of Puerto Rico v. Turnage,* 657 F.Supp. 1033, 1035–36 (D.P.R.1987) (parens patriae standing inappropriate because state merely sought to "litigate a personal claim" of one of its citizens). Rather, the state has alleged conduct that has potentially wide-spread impacts, impacts that are unlikely to be addressed fully if the controversy is cabined in the realm of private litigation.

### 2. *EEOC's Parallel Lawsuit*

As part of its challenge to the Attorney General's standing, Bull further argues that nothing in the ADEA permits simultaneous enforcement of the statute by two different government entities. Bull maintains that since the EEOC has brought a functionally identical lawsuit, seeking largely the same relief, the Attorney General's lawsuit should not be permitted to proceed. I disagree.

It is true that the posture of this case, in which both a state attorney general and the EEOC are seeking the same relief against a single defendant, is unorthodox. However, there is nothing in the statute that precludes the Attorney General's involvement simply because the EEOC later brings a similar lawsuit. As long as the Attorney General has standing and has complied with all relevant procedural prerequisites, I will not dismiss his suit simply because of Bull's claim, as yet unsubstantiated, that the Commonwealth's action presents a greater burden on Bull to defend. Any burden on Bull can be minimized through consolidation of the twin suits under Rule 42, and careful monitoring of its discovery obligations.[11]

11. In fact, the ADEA actually contemplates twin lawsuits against a single defendant based on the same conduct. The enforcement provision of the ADEA, section 626(c)(1), permits "any person aggrieved" to bring a civil action to enforce the statute, providing the EEOC has not filed suit first. Here, it is undisputed that the Commonwealth filed its suit first, even if only by nineteen minutes.

### 3. Article III and Statutory Limitations

Bull next argues that the Attorney General has not satisfied the elements of Article III standing, and is not a "person aggrieved" under the meaning of the ADEA. Again, I disagree.

 First, constitutional standing is satisfied wherever the state has demonstrated parens patriae standing. *Maryland People's Counsel v. Federal Energy Regulatory Comm'n*, 760 F.2d 318, 321 (D.C.Cir.1985) ("It is unquestionable that a state, in its parens patriae capacity, does qualify as 'personally ... suffer[ing] some actual or threatened injury....'") *citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Mid Hudson Medical Group*, 877 F.Supp. at 149 (once state has demonstrated parens patriae standing, standing inquiry is complete); *Support Ministries*, 799 F.Supp. at 279 (same). Because the Commonwealth has parens patriae standing to pursue this action, Article III no longer poses an obstacle.

 Moreover, the Attorney General is authorized to bring this suit under the terms of the ADEA. The enforcement provisions of the ADEA permit any "person aggrieved" to bring a civil action for legal or equitable relief. "Person" is defined as "one or more individuals, partnerships, associations, labor organizations, corporations, business trusts, *legal representatives*, or any organized group of persons." 29 U.S.C. § 630(a) (emphasis added). Because Massachusetts law authorizes the Attorney General to bring such actions as he deems in the public interest, he is a "legal representative" of the people of the Commonwealth for the purposes of this action. *See* Mass.Gen.Laws ch. 12, § 10. Indeed, there is nothing unusual about a state seeking enforcement of federal laws that do not specifically provide for state enforcement. *See, e.g., Snapp*, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995; *Pennsylvania v. Porter*, 659 F.2d 306, 316–17 (3d Cir.

1981), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982) (state can seek relief for victims of police misconduct under 42 U.S.C. § 1983); *Mid Hudson Medical Group*, 877 F.Supp. at 146 (state can sue to enforce Americans with Disabilities Act, citing numerous instances where states brought federal law actions under their parens patriae powers).

### 4. The Requirement of Named Individuals

 Finally, Bull seeks to dismiss the Commonwealth on standing grounds because the Commonwealth's complaint does not allege damage to any specific Bull employee.[12] Bull argues that the central issue of the case—the validity of the waivers in the severance plan—cannot be resolved without considering the individual circumstances of employees who actually signed the waivers. Bull asserts that an employee can ratify an otherwise invalid waiver by accepting its benefits. Since the question of ratification can only be tested with regard to specific, named employees, Bull concludes, the Commonwealth's failure to name individuals in the complaint is fatal.

 At the time Bull submitted its motion to dismiss, the circuits were split on whether an invalid waiver under the OWBPA could be ratified, and the First Circuit had not yet addressed the issue. However, recent decisions by both the First Circuit and the Supreme Court have resolved the question: a waiver that fails to meet the requirements of the OWBPA cannot be ratified. *See Oubre v. Entergy Operations, Inc.*, — U.S. —, —, 118 S.Ct. 838, 841, 139 L.Ed.2d 849 (1998) (release that does not conform to the OWBPA cannot bar an ADEA claim, and retention of benefits does not amount to ratification of the waiver); *American Airlines, Inc. v. Cardoza–Rodriguez*, 133 F.3d 111, 120–21 (1st Cir .1998) (noting that Congress rejected traditional contract principles in enacting the OWBPA, and holding that an employee's retention of

---

12. Bull styles this argument as one of "standing" because that was the approach taken by a district decision upon which it relies. *EEOC v. Sears,*

*Roebuck and Co.*, 883 F.Supp. 211, 214 (N.D.Ill. 1995).

benefits does not act to ratify a waiver that violates the OWBPA).

In light of these decisions, Bull's argument must fail. Case by case examination of the underlying facts of each individual's post-waiver conduct is unnecessary in order for this Court to determine whether or not the waivers comply with the OWBPA.

### B. *Procedural Requirements of the OWBPA*

■■■ Bull next argues that the Commonwealth's claim is barred by the "timeliness" provisions of the ADEA. Bull argues that the July 16, 1996, letter from the EEOC to the Attorney General, notifying him of the EEOC's termination of its conciliation efforts, initiated the ninety day period in which a civil action may be brought. 29 U.S.C. § 626(e). This section states in part:

> If a charge filed with the Commission under this chapter is *dismissed or the proceedings of the Commission otherwise terminated* by the Commission, the Commission shall notify the person aggrieved. A civil action may be brought under this section by a person defined in Section 630(A) of this title against a respondent named in the charge within 90 days after the date of the receipt of the letter. (emphasis added).

It is undisputed that the Commonwealth did not file its claim against Bull in this Court within ninety days of receipt of the "failure to conciliate" letter: the suit was filed June 12, 1997, approximately eleven months after the letter was sent.

Bull's argument is meritless. First, the language of the statute is quite clear: the ninety day clock starts ticking only when the charge filed with the EEOC is "dismissed or the proceedings ... otherwise terminated by the Commission." The EEOC, however, did

nothing of the sort. The letter informed the parties that the conciliation efforts had not been productive and that the case was being forwarded to a regional attorney for possible litigation. The letter evinces no intent to dismiss or otherwise terminate the charge, as the statute demands. To the contrary, the letter indicates that the charge was still being pursued by the EEOC. This reading is supported by the EEOC's May 13, 1997, notice of right to sue letter, upon which a notation was checked off with an "X" that stated, "The EEOC is continuing its handling of your ADEA case." [13] *Compare Garfield v. J.C. Nichols Real Estate,* 57 F.3d 662, 664 (8th Cir.1995) (valid termination letter stated "the Commission will take no further action" on the claim).

■■■ Moreover, when the EEOC terminates a charge, it is obligated to inform the claimant that a lawsuit must be filed within ninety days of the claimant's receipt of that termination notice. *See McConnell v. Thomson Newspapers, Inc.,* 802 F.Supp. 1484, 1499 (E.D.Tex.1992) ("it is concluded that the EEOC must notify the person aggrieved ... when its informal methods of resolution fail, and that it has ninety days from the date of receipt of that notice by the person aggrieved to file a civil action."); [14] *see also* H.R.Rep. No. 102–40(I) at 97 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 635 (ADEA imposes an "explicit obligation on the EEOC to notify complainants ... that the agency's action triggers a ninety day limitations period for filing suit.").

The cases cited by Bull involve termination letters that explicitly notify the claimant of the ninety day window for filing an action. *See Littell v. Aid Ass'n. for Lutherans,* 62 F.3d 257, 258 (8th Cir.1995) (bold print in letter notified claimant that he had ninety days from receipt of the letter to sue); *Gar-*

---

**13.** Indeed, the notation was one of two options that the EEOC checked off on the form letter. The other option, which was not checked, reads, "The EEOC is closing your case...." and notifying the Commonwealth in bold type that an ADEA lawsuit must be filed within ninety days of receipt of the notice.

**14.** Insofar as the *McConnell* decision can be read to suggest that the EEOC letter regarding termi-

nation of its conciliation efforts started the ninety day clock running, I disagree. *See id.* at 1500 ("The limitations statute should likewise be read to link the timeliness of EEOC civil suits to notice of the end of voluntary compliance measures ..."). The statute suggests that the EEOC's involvement must be concluded completely.

*field,* 57 F.3d at 664 (same). The July 16, 1996, letter, in contrast, contained no mention whatsoever of the Attorney General's right to sue or of the ninety day limitations period.

I find that the "failure to conciliate" letter sent by the EEOC on July 16, 1996, did not trigger the ninety day limitation period of section 626(e). The limitations period therefore poses no obstacle here.

**C. *Failure to State a Claim upon which Relief can be Granted***

 Section 626(f) of the OWBPA, on which the Commonwealth bases part of its suit, sets out the conditions for a knowing and voluntary waiver of ADEA rights and claims. Bull argues that even if the Commonwealth has standing to bring this action, its complaint fails to state a claim under this section upon which relief can be granted, and hence must be dismissed.

The gravamen of Bull's argument is that the conditions set out in this section do not give rise to an independent cause of action. It argues that the sole remedy for a plaintiff-employee who has signed a nonconforming waiver is that the waiver is ineffective as a defense in an age discrimination suit. In other words, the validity of the waiver only can be tested once the employee repudiates the agreement and brings an ADEA action against the employer, and the employer raises the waiver as a defense to the action. What is not available, according to Bull, is a suit for declaratory or injunctive relief in the absence of an actual discrimination action.

While this is an issue of first impression in this circuit, there is some case support for Bull's position. Four district courts in other circuits have concluded that the OWBPA does not permit an independent cause of action. However, I believe that these cases are either factually distinguishable from the present case or wrongly decided. Moreover, even if I were to agree with Bull's argument, only two of the five counts brought by the Commonwealth would be dismissed.

**1. *The Commonwealth's OWBPA Action***

As an amendment to the ADEA, the OWBPA was introduced into the code not as a free-standing statute, but as multiple modifications to various existing sections of the ADEA. The waiver conditions of the OWBPA at issue here are articulated in subsection (f) of section 626 of the ADEA. The existing provision authorizing civil actions under the ADEA is spelled out in subsection (c) of that very same section, in language that provides, "[a]ny person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter."

The civil action provision of the ADEA applies equally to suits brought under the waiver provisions that modified section 626. I find it unreasonable to expect that Congress should have added another enforcement provision to the amendment, as Bull argues, when one already exists in the amended section. This is particularly true in light of a broad civil enforcement regime authorized to "effectuate the purposes of this *chapter,*" a chapter that includes section 626(f)'s requirement that waivers be knowing and voluntary within certain clear parameters. *See Air Transport Ass'n of America v. Los Angeles,* 844 F.Supp. 550, 555 (C.D.Cal. 1994) ("an amendment to an act ... falls under the same enforcement scheme as the act itself"); *see also Lovshin v. Department of Navy,* 767 F.2d 826, 842 (Fed.Cir.1985) ("The normal assumption, where Congress amends one part of a law leaving another part unchanged, is that 'the two were designed to function as parts of an integrated whole' ...."), *citing Markham v. Cabell,* 326 U.S. 404, 411, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

I find that the broad enforcement scheme articulated in subsection (c) of section 626 covers the waiver requirements articulated in subsection (f) of that section. If Congress sought to preclude independent enforcement of the waiver conditions—and limit the remedy in the way that some cases have done, and that Bull argues I should—it would have either said so explicitly or placed the OWBPA in a different part of the statute.

This conclusion can be supported by considering to the purposes of the OWBPA in light of the circumstances of this case. Congress amended the ADEA out of concern

that older workers are vulnerable to coercion or manipulation in waiving their rights to seek relief under the ADEA. H.R.Rep. 101–664, at 20 (1990). Congress was particularly concerned that older workers might waive their rights when the release was related to large scale terminations in which most workers would not realize immediately that their age may have been a factor in termination decisions. *Id.* at 53. Therefore, Congress sought to insure that older workers were fully appraised of their rights and had access to all relevant termination information before signing any waivers.

Bull's crabbed reading of the enforcement provision of the statute undermines these purposes, particularly under the circumstances presented here. The critical issue of this case is that if a former employee repudiates the waiver and brings an ADEA action against Bull, he or she is immediately subject to suit to return the severance benefits received and to indemnify Bull for the costs of defending the ADEA action. An individual who attempts to litigate the validity of the waiver in the context of an ADEA suit is thus subject to immediate and draconian penalties.

Bull's interpretation of the enforcement provision thus presents a cynical Catch–22. According to Bull, the only way to test the validity of a waiver is when it is offered as a defense to an actual ADEA claim. However, given the terms of this waiver, very few former employees are going to risk the devastating penalties involved in bringing their substantive claims.[15]

Under Bull's proffered interpretation, employers could functionally insulate themselves from ADEA suits and ignore the waiver provisions of the OWBPA simply by including a drastic penalty provision in the waiver as Bull has done. This interpretation offends the intent of Congress in enacting both the ADEA and the amendments of the OWBPA.

### 2. *The Sears Line of Cases*

Admittedly, other courts have concluded otherwise. In *EEOC v. Sears, Roebuck and Co.*, 883 F.Supp. 211 (N.D.Ill.1995) ("Sears II"), the EEOC brought suit against Sears, Roebuck and Co. on the basis of waivers included in the company's severance plan. According to the EEOC, the waivers did not meet the conditions set out in section 626(f) of the OWBPA.

On a motion to dismiss, the district court found three separate grounds on which to dismiss the EEOC's claim. The third was the court's conclusion that a violation of the waiver conditions in section 626(f) does not give rise to an independent cause of action. The court noted that "[n]either section 626(f), nor any other section of the ADEA ... suggests that Congress intended to create a separate cause of action. On the other hand, section 616(f) does state that the affect [sic] of an invalid release, one which was not executed knowingly and voluntarily, is to bar the employer from relying on it as a defense," citing to 29 U.S.C. § 616(f). *Id.* at 215. Relying on this language, the *Sears II* court refused to permit a suit based on the company's alleged violation of the waiver conditions.

The holding in *Sears II* was relied on, without any independent analysis, by the court in *EEOC v. Sara Lee Corp.*, 923 F.Supp. 994, 999 (W.D.Mich.1995). Citing to *Sears II*, the court noted simply that "failure to meet the requirements [of the OWBPA] does not constitute a separate cause of action and is not a violation of the ADEA. Instead ... a waiver that does not comply with the requirements is not valid and an employer may not rely upon the waiver as a defense." *Id.*

The *Sears II* court's conclusion is puzzling indeed. There is no section 616(f) to the OWBPA: the ADEA begins with section 621. Nor is there language in any other section of the statute that states that the effect of an

---

**15.** No such circumstances were at issue in any of the cases cited by Bull. In each one, the signatories to the allegedly invalid waivers retained the option of litigating its validity in the context of a substantive age discrimination claim without incurring any immediate penalty. Had the waivers in these cases been as punitive as they are here, I suspect that the courts would not have concluded as they did.

invalid release is to bar the use of the waiver as a defense.

The same conclusion was reached in *Williams v. General Motors,* 901 F.Supp. 252, 254–55 (E.D.Mich.1995), albeit without citation to *Sears II* or phantom sections of the statute. In *Williams,* individual employees (rather than the EEOC, as in the other two cases) brought suit against General Motors under the ADEA and the Americans with Disabilities Act (ADA). Under the ADEA, the plaintiffs brought substantive age discrimination claims as well as a count under the waiver provisions of the OWBPA. The court dismissed the OWBPA claim.

The court refused to accept that "a violation of the procedural requirements above may be extrapolated into a holding that a substantive cause of action for age discrimination exists." *Id.* at 255. According to the court, the "only conclusion" that followed from Congress' waiver conditions is that an employee who had signed an invalid waiver does not lose the right to bring an ADEA claim against the employer.

Finally, the issue was noted briefly in dicta in an unreported case, also brought by an individual rather than the EEOC. *See Lawrence v. National Westminster Bank, N.J.,* 1995 WL 506043, at *7–8 (D.N.J.1995), *aff'd in part, rev'd in part,* 98 F.3d 61, 73 (3rd Cir.1996) ("we need not decide whether the waiver provisions of OWBPA may be enforced through private civil actions"). At the time plaintiff had been terminated by his employer, the company had offered him severance benefits in exchange for his signing a waiver of claims. The plaintiff refused to sign the waiver.

On defendant's motion for summary judgment, the OWBPA count, along with all the other counts, was dismissed. Since the plaintiff had never signed the allegedly violative waiver, there was no actionable injury. The court added briefly that even if the case had not been dismissed, the waiver conditions did not give rise to an independent cause of action: "Congress could have, but did not, create a private right of action" for violation of the waiver conditions. *Id.* at *8.

I find little reason to follow the *Sears II* line of cases. It presents different circumstances from these and, in one case, a curious misstatement of law. None of these cases can override the ADEA's express creation of a private right of action for violations of the entire statute, 29 U.S.C. § 626(c), a statute which was amended by the OWBPA. In light of the structure of the ADEA and OWBPA, and the intent of the statutes, I see no reason to bar the Commonwealth's action.

### 3. Counts I, IV, and V

Even if I agreed with Bull that the waiver conditions of the OWBPA do not permit an independent cause of action, dismissal would be appropriate only as to two of the five counts in the Commonwealth's complaint. Only counts two and three arise directly out of violations of these conditions.[16] The other counts refer to other parts of the OWBPA or sections of the ADEA itself.

### a. Count I: OWBPA § 626(f)(4): Interference with Right to File a Charge with the Commission

Count I of the Commonwealth's complaint alleges a violation of section 626(f)(4) of the OWBPA. This provision states, inter alia, that "[n]o waiver may be used to justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the Commission." This provision was not at issue in the *Sears II* case and its progeny, which were exclusively concerned with whether or not the plaintiffs had stated a claim with regard to the OWBPA's standards for "knowing and voluntary" waivers. Moreover, the reasoning employed in those decisions—that the validity of the waiver can be tested while litigating the substantive age discrimination claim—is inapplicable here.

The provision at issue seems to involve interference with claims and investigations of the EEOC, not other enforcement bodies.

---

**16.** Count II of the Attorney General's complaint states that the waivers fail to include the required reporting information under § 626(f)(1)(H), and that Bull failed to provide the required 45 day waiting period under § 616(f)(1)(F)(ii). Count III states that the employees signing the waiver received no additional consideration for their agreement, in violation of § 626(f)(1)(D).

*American Airlines,* 133 F.3d at 118 n. 7; *EEOC v. Astra USA, Inc.,* 94 F.3d 738, 744 (1st. Cir.1996). There are questions about whether the Commonwealth ultimately will be able to sustain this claim, given that the only actual interference alleged is with an MCAD proceeding, not an EEOC proceeding. Nevertheless, since this issue has not been fully briefed, on the state of the record before me, I will deny Bull's motion to dismiss.

### b. Count IV: Unlawful Employment Practices under the ADEA § 623(a)

Count Four of the Commonwealth's complaint states that the violations of the OWBPA described in Counts I, II, III represent "unlawful employment practices" under the terms of the ADEA.[17] By stating a claim under the ADEA rather than the OWBPA, the Commonwealth argues, Count IV is not subject to the reasoning employed by the *Sears II* court, as the ADEA unambiguously authorizes civil causes of action.

The gist of Count Four is that Bull's conduct in requiring the waivers in exchange for severance pay represents both disparate treatment of older workers and has a disparate impact on them. The Commonwealth alleges that, under the circumstances of the Bull plan, requiring older workers to waive ADEA rights in order to receive severance pay, when younger workers receive the same amount of consideration without giving up ADEA rights, has a disparate impact on older workers. As such, the Commonwealth argues, the waivers discriminate substantively, independent of the alleged violations of the OWBPA's waiver provisions. Thus, even if the OWBPA did not permit a civil enforcement action, Count Four states a claim under the ADEA, and consequently cannot be dismissed.

### c. Count V: Retaliation under ADEA § 623(d)

Count Five alleges that Bull's waivers and conduct thereunder violate section 623(d) of the ADEA. Section 623(d) provides, inter alia, that an employer may not discriminate against an employee because the employee has "made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or litigation under this chapter."[18]

The Commonwealth alleges that by providing that an employee shall return severance payments and indemnify the corporation if he or she brings an ADEA claim, the waivers "threaten" retaliatory conduct for engaging in protected activity under this section. Moreover, the Commonwealth's complaint alleges that Bull has in fact taken retaliatory action, by seeking the return of severance payments in the case of one individual who signed the waiver but later filed a charge with the MCAD against Bull.

Bull offers two arguments in support of its motion to dismiss this count. I find neither of them persuasive.

#### (1) "Threatening" Retaliation

First, Bull notes that there is no case support for the proposition that "threats" of retaliation are actionable under this provision. Granted, whether or not "threats" of retaliation are actionable under section 623(d) appears to be an issue of first impression. If Bull's argument—that threats of retaliation are not actionable—is

---

17. § 623(a) states in part:

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual or employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

18. Section 623(d) prohibits discrimination against an employee for participating in investigations, proceedings or litigation under the ADEA. Although the section does not contain any reference to "retaliation," many courts use the term as a shorthand way to distinguish substantive age discrimination claims from claims of discrimination based on the exercise of legal rights granted by the ADEA. *See, e.g., EEOC v. Board of Governors of State Colleges and Universities,* 957 F.2d 424, 427 (7th Cir.), *cert. denied,* 506 U.S. 906, 113 S.Ct. 299, 121 L.Ed.2d 223 (1992). I will follow suit here.

correct, then a plaintiff or government enforcement body would have to wait until an employer actually retaliates before invoking the protections of section 623(d). Where the threatened retaliation is clearly illegal, where it chills the redress of legal rights, however, such a conclusion can only be described as absurd.

Under the Commonwealth's allegations, Bull has a finger on the trigger of a gun pointed at each of the former employees who signed the waivers. The moment one of them engages in conduct clearly protected by the ADEA—filing a charge, participating in litigation—the trigger is pulled. I do not believe that section 626(d) requires that the Commonwealth sit idly by and wait until that moment before seeking the Court's assistance under this provision.

Bull's reliance on *EEOC v. Sears, Roebuck & Co.*, 857 F.Supp. 1233, 1239 (N.D.Ill.1994) ("*Sears I*"), an earlier decision in the Sears litigation, is unavailing. *Sears I* addressed the question of whether an employer's practice of conditioning severance payments on the signing of a waiver that did not comply with the OWBPA was actionable under section 623(d). The court found that it was not. The *Sears I* court dismissed the retaliation claim because a refusal to sign a waiver is not protected by the retaliation provision, which prohibits discrimination for opposing a company practice, or participating in a charge or litigation. The Commonwealth's claim, in contrast, arises out of the harm that Bull threatens to inflict against employees who file a charge of discrimination after signing a waiver. The filing of a charge or lawsuit is unambiguously a protected activity under section 623(d), and therefore *Sears I* is inapplicable.

 In any event, the Commonwealth alleges that Bull has actually retaliated against one individual, who after signing the waiver filed an age discrimination claim with the MCAD against Bull. According to the complaint, Bull filed a state court action against that individual seeking the return of severance paid under the waiver agreement. As

such, the Commonwealth's claim under section 623(d) no longer operates solely in the theater of "threats" or potential retaliation, but involves an allegation of real conduct prohibited under this section. Dismissal is consequently unwarranted.

### (2) *Enforcement of Waivers as Retaliation*

Second, Bull presents its real or potential conduct—filing suit under the waiver seeking to have an individual's severance repaid—as merely "upholding the waiver," not retaliation. While I do not necessarily disagree, for me to dismiss the Commonwealth's claim at this stage of the proceedings, I would have to find that the enforcement of a waiver agreement by an employer could never represent retaliation. I cannot so conclude.

At least one district court offers support for Bull's analysis of the retaliation provision. In *Blistein v. St. John's College*, 860 F.Supp. 256, 268–69 (D.Md.1994), *aff'd* 74 F.3d 1459 (4th Cir.1996), the court found that an employer's breach of contract action against an employee to recover severance benefits was not retaliation with the meaning of this section. The plaintiff had earlier agreed to withdraw an ADEA claim in exchange for various retirement benefits, but later breached the agreement by refiling the claim.[19] The court noted that to find such conduct to be retaliatory would severely limit the ability of defendant-employers to protect their rights under severance agreements. *Id.* at 269. The Fourth Circuit agreed, noting in a footnote that the defendant's counterclaim to enforce a valid contract could not be considered retaliation. *See* 74 F.3d at 1465 n. 3.

 The *Blistein* court's reasoning is basically sound. Because Congress provided for waivers of ADEA claims under certain conditions, it cannot have intended that an employer would be liable for retaliation when it seeks to enforce a valid waiver. Hence, the Commonwealth's citations to pre-OWBPA authority concluding otherwise are unavailing: the OWBPA altered the landscape

---

**19.** The court did not address the question of whether the agreement was a "waiver" subject to

the conditions of the OWBPA.

with regard to the intersection of waivers and the ADEA's existing retaliation provision.[20] *See, e.g., EEOC v. Cosmair, Inc.,* 821 F.2d 1085, 1089 (5th Cir.1987) (if an employer stopped providing the employee benefits to which he was otherwise entitled simply because employee filed a charge, the company would be violating the retaliation provision); *EEOC v. U.S. Steel Corp.,* 671 F.Supp. 351, 358 (W.D.Pa.1987) (finding that similar punitive waiver provision violated section 623(d) just by raising the "mere possibility" that individuals would be deterred from participating in ADEA claims).[21]

 That is not to say, however, that an attempt to enforce a waiver will never be actionable retaliation, nor does the court's conclusion in *Blistein* so require. Insofar as the waiver itself is valid under the stringent standards of the OWBPA, an employer is not retaliating by merely seeking to enforce it. Insofar as the waiver fails to meet these standards, however, an employee can make a claim of retaliation if the employer takes discriminatory action against the employee for engaging in protected conduct.

The Commonwealth's retaliation claim turns on whether or not the waivers at issue are valid under the OWBPA, a question that has yet to be litigated before this Court. Bull's attempt to dismiss this count at this stage of the proceedings is premature.

### 4. *Conclusion*

In sum, Bull's argument that the OWBPA should be read to preclude the Commonwealth's effort to seek injunctive and declaratory relief in this case fails. The cases relied upon by Bull misstate the law, and involve very different circumstances from those here. Moreover, even if I agreed with Bull, dismissal would be warranted only with regard to counts two and three of the Commonwealth's complaint.

**20.** However, the OWBPA limited the scope of an employer's right to enforce a waiver: an employer cannot use a waiver to "justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted *by the Commission.*" 29 U.S.C. § 626(f)(4) (emphasis added).

**21.** Moreover, the Commonwealth's citation to post-OWBPA authority is equally inapplicable because those cases do not involve the waiver pro-

### III. *CONCLUSION*

Bull has raised a number of objections to the Commonwealth's participation in this age discrimination action. Many of them involve issue of first impression in this Circuit and even in the federal courts. However, none is persuasive: I find no grounds to block the Commonwealth from participating in this action. The Attorney General's office in many states, this one in particular, have long and proud traditions of vigorous, zealous enforcement of the laws, particularly those designed to protect the citizens of the state and to challenge the ugly specter of discrimination in all of its forms. The Commonwealth here seeks to perpetuate that tradition by challenging conduct that it alleges is not only discriminatory, but that also is designed to insulate Bull from private remedial action. The circumstances alleged by the Commonwealth cry out for public involvement, and I can see no reason that the Attorney General's office should not be permitted to proceed.

**SO ORDERED.**

visions of the OWBPA. *Board of Governors,* 957 F.2d at 428 (finding retaliation in collective bargaining provision that provided that grievances could not proceed to arbitration if employee brings ADEA claim); U.S. *EEOC v. General Motors Corp.,* 826 F.Supp. 1122, 1125–26 (N.D.Ill. 1993) (policy of withholding internal grievance procedure from employees who file discrimination charges to constitute retaliation).